E. S. DOWNES *et al.* v. G. L. BENNETT *et al.*
No. 11,753.   ( 66 Pac. 623.)

SYLLABUS BY THE COURT.

INJUNCTIONS— *Parties Plaintiff— Boycotting — Condition Precedent.*  A voluntary association, formed for the mutual benefit of its members, in the business of buying and selling cattle on the market, adopted a rule, or by-law, prohibiting one another from dealing on the market, either with non-members engaged in the same business or with others who dealt with such non-members, and they enforced it by other rules, or by-laws, making its violation punishable by fine or expulsion from the association. *Held*, that because such rules, or by-laws, operated directly on the members of the association alone, and only indirectly and remotely on those outside of it, the latter did not have sufficient interest to maintain an action of injunction to restrain the association from the enforcement of the penal provisions in question.

Error from Wyandotte court of common pleas ; WM. G. HOLT, judge.   Opinion filed November 9, 1901.   *In banc.*   Reversed.

*Hutchings & Keplinger, I. P. Ryland* and *R. E. Ball,* for plaintiffs in error.

*J. D. McCue,* and *F. D. Mills,* for defendants in error.

The opinion of the court was delivered by

DOSTER, C. J. : This case has been twice argued, prior and subsequently to the increase of membership of the court under the recently adopted constitutional

amendment, and we have given to it much earnest thought. The case is a novel one, and its peculiar features have been given a complexity of appearance by the false light in which they first exhibited themselves. The question involved is really little more than one of mere practice. It is : Can a party plaintiff enjoin a voluntary unincorporated association from fining or expelling one of its members for his violation of a by-law of the association prohibiting him from trading on the market with the plaintiff, or from trading with others who do trade with him? In other words : Can a party aggrieved at the action of a voluntary association, which action, so far as direct effect is concerned, expends itself wholly on the members of the association, interfere in its internal management and discipline to prevent such action toward such members because of the indirect injurious effect it has on him, the aggrieved party? This question is not as much discussed by counsel as some others, but in our judgment it lies at the beginning point of all inquiry into the controversy, and therefore must receive first attention.

The facts of the case are that two voluntary unincorporated trading associations exist at Kansas City. One of them is called the "Traders' Live-stock Exchange," the other the "Farmers' Live-stock Association." For convenience of designation we will speak of both of them as "associations." They were organized for the mutual benefit of their members, but as associations they do no business whatever. The members of each compete with one another as though nowise connected in their organization. The Traders' association adopted and enforced two by-laws, or rules, reading as follows :

"Rule 10. This exchange will not recognize any yard trader unless he is a member of this exchange."

"Rule 15.   All persons convicted of any violation of any of these rules shall be subject to fine, suspension, or expulsion, as recommended by the executive board."

The effect of the above rules was detrimental to the members of the Farmers' association, because, as construed and enforced, they operated to deter members of the Traders' association from doing business on the market with them, the members of the Farmers' association, or doing business on such market with others who did business with the members of the latter association.

The memers of the Farmers' association thereupon instituted an action of injunction, in their individual names, against the members of the Traders' association, in their individual names, to restrain them from the enforcement of the above-quoted by-laws, or any other like coercive rules, the effect of which might be to deter themselves or others from doing business on the market with the members of the Farmers' association.   In the petition for the injunction allegatlons were made that the purpose of the adoption and the effect of the enforcement of the rules were to close the cattle market of Kansas City to the members of the Farmers' association, and to monopolize it in the hands of the members of the Traders' association; and allegations were also made that the adoption and enforcement of the rules had produced, as to the members of the Farmers' association, in their business on the market, what is called a "boycott."

A trial of the case was had, findings of fact and conclusions of law were made, and a judgment of perpetual injunction rendered, as prayed for by plaintiffs. These findings, conclusions and judgment were as follows :

"CONCLUSIONS OF FACT.

"1. The Kansas City stock yards is a public market, where live stock is sold to the person paying the agreed price therefor.

"2. That the cattle business of said stock-yards is generally done by two classes of dealers in live stock, namely "commission men" and "yard traders.

"3. That the said commission men buy and sell cattle at said yards for others and charge a commission therefor, and do not buy or sell any cattle on their own account for profit.

"4. That said yard traders buy and sell cattle at said yards on their own account for profit, and do not buy or sell any cattle for others on commission.

"5. The said commission men belong to an association composed exclusively of commission men.

"6. That there are eighty concerns engaged at said yards in buying and selling cattle for others on commission.

"7. That said yard traders do not buy or sell fat cattle but deal wholly in other classes of cattle.

"8. That about one hundred and eighty of said yard traders belong to the Traders' Live-stock Exchange.

"9. That the said Traders' Live-stock Exchange is an organization having for its officers a president, vice-president, secretary, and treasurer.

"10. That said Traders' Live-stock Exchange has an executive committee consisting of eight members, who are appointed by the president with the approval of the exchange.

"11. That at the preliminary organization of said exchange the membership fee was fifty cents, which was raised to ten dollars at the permanent organization. Subsequently the membership fee was raised to $250, and afterwards to $500, which is now the amount charged each person who now becomes a member of said exchange.

"12. The membership fee in said exchange was

not raised at any time because of any financial neces-sity therefor, but to deter irresponsible yard traders from making application for membership in said exchange, and to make the membership more valu-able, in order that the penalty of expulsion for non-observance of rules of the exchange would be more severe, and a better compliance with the rules be thus obtained, and to limit the membership of said ex-change.

"13. That the defendants are members of said Traders' Live-stock Exchange.

"14. That the members of said Traders' Live-stock Exchange do ninety per centum of the business done by the said yard traders at said stock yards.

"15. That said Traders' Live-stock Exchange was organized for the mutual benefit of its members, and as an organization does not deal in cattle or do any other business for profit.

"16. That it is the settled purpose of said Trad-ers' Live-stock Exchange, as an organization, to com-pel its members to cease and refuse to do any busi-ness with commission men who deal with a yard trader who is not a member of said Traders' Live-stock Exchange.

"17. That in pursuance of that purpose members of said Traders' Live-stock Exchange are notified by their executive board (which is the governing body of the said exchange) not to deal with a commission concern that has been found dealing with a yard trader who is not a member of said Traders' Live-stock Exchange.

"18. That a member of said Traders' Live-stock Exchange who does not obey said notice after having received it, but continues to deal with an offending commission concern is fined by said executive board and if he does not pay his fine he is expelled from said exchange.

"19. That it is also the settled purpose of said Traders' Live-stock Exchange, as an organization, to compel its members to cease and refuse to deal or to have cattle business connection with any yard trader

42—63 KAN.

who is not a member of said Traders' Live-stock Exchange.

"20. That in pursuance of that purpose members of said Traders' Live-stock Exchange, when found dealing with such yard traders, have been and will be fined by the executive board of the said exchange.

"21. That said Traders' Exchange, in pursuance of its settled purpose, has, through its executive board, fined its members for trading with commission men who dealt with yard traders who were not members of said exchange.

"22. That the result of the members of said Traders' Live-stock Exchange ceasing to do business with such commission concerns as had dealt with yard traders who were not members of said exchange was to withdraw from such commission concerns ninety per centum of their yard traders' business.

"23. That in every instance where the members of said Traders' Live-stock Exchange ceased to do business with a commission firm, as above stated, the members of said exchange resumed business with said commission firm upon said commission firm ceasing to deal with yard traders who were not members of said Traders' Live-stock Exchange.

"24. That the yard traders who were not members of the Traders' Live-stock Exchange were materially injured in their business by not being able to freely deal with the commission men doing business at the stock-yards and other yard traders who were members of said Traders' Live-stock Exchange and who would have dealt with them but for said action of said executive board.

"CONCLUSIONS OF LAW.

"1. The members of the Traders' Live-stock Exchange could, either individually or collectively, voluntarily cease doing business with any commission man or yard trader, for any reason whatsoever, without incurring any legal liability therefor.

"2. The action of the executive committee of the Traders' Live-stock Exchange in compelling members

of said exchange, through fines, to cease doing business with either commission men or yard traders with whom they would otherwise have done business was illegal.

"3. The settled purpose of said Traders' Live-stock Exchange to compel its members, or any of them, against their will, to cease and refuse to do business with commission men or yard traders, for whatsoever cause, is a combination to do injurious acts by way of restraint, coercion, and intimidation, and is therefore an unlawful purpose.

"4. That the defendant will be perpetually enjoined from, either directly or indirectly, by fine or expulsion from the Traders' Live-stock Exchange, or otherwise, restraining, coercing and intimidating any one or more of its members from dealing with or having business connection with any commission man or yard trader at the Kansas City stock-yards who is doing or desires to do business with the plaintiffs or any of them.

### " JUDGMENT.

"It is therefore ordered that the defendants, and each of them, members of the Traders' Live-stock Exchange, be and they are perpetually enjoined and restrained from, either directly or indirectly, by fine or expulsion, or by threats of fine or expulsion, of the members of the Traders' Live-stock Exchange, restraining, coercing or intimidating any one or more of the members of the said Traders' Live-stock Exchange from dealing with or having business connection with any commission man or yard trader at the Kansas City stock-yards who is doing or desires to do cattle business of any kind or character with plaintiffs."

To reverse the above judgment error has been prosecuted to this court.

The argument of the case was largely on the laws relating to what are called "trusts" and "monopolies," and those prohibiting what is called "boycotting," but the plaintiffs in error, the defendants below,

as their initial proposition, make the claim that the defendants in error, the plaintiffs below, have not shown that interest in the subject-matter of the controversy which entitled them to sue.   This claim we are constrained to think well taken.   Let the fact be recalled, and stated again, that the plaintiffs below do not complain of any conduct of the defendants below directly operating upon or affecting them, but they complain of that which directly expends its force upon the defendants themselves, and which only reaches to the plaintiffs in an indirect way and as a secondary consequence.

It is a settled doctrine of the law that injuries remotely and indirectly attributable to an originating cause cannot be made the subject of a legal action. A direct and necessary connection must be traced backward along a line of sequences in order to establish the occurrence of effect from cause.   This is most frequently instanced in the case of claims for damages for personal injuries for the violation of contracts, but the rule is general and applies as well to actions for preventive or other equitable relief as to actions at law for compensation.   Suppose some member of the plaintiff association had sued the defendant association for damages for maliciously causing him to be "boycotted" in his business, and only proved the adoption and enforcement of the obnoxious by-laws above quoted—that and nothing more, could a recovery be had?   Certainly not.   In such case it would have been necessary to prove an actual loss of trade— prove that the public, or some one or more of it, who otherwise would have dealt with the plaintiff, failed, as a direct result of the wrongful act, to do so.   Now, in this case, does it follow as a conclusion of fact which the law draws from the premises, that the members

of the defendant association would trade with the
members of the plaintiff association but for the con-
straint of the by-laws in question?   Does it follow
in the order of causation that if the by-laws should
be repealed a channel of trade would be opened
up between plaintiffs and defendants, as the removal
of an obstruction from a stream would start the
flow of its water?   Certainly not.   It might do so,
but the law does not know as a fact that it would
have that effect; and the law is therefore power-
less to grant the relief asked, because it cannot
render its judgments on a mere conjecture of their
efficacy.   When one is engaged in business and a
number of persons conspire to slander, *and do slan-
der*, the merchantable quality of his goods, or con-
spire to seduce, *and do seduce*, his employees to leave
his service, or conspire to repel, *and do repel*, his cus-
tomers by obstructing the passage to his doors, the
law perceives the connection between act and con-
sequence, and it gives relief, preventive or compensa-
tory, as it may be able; but it is not possible for it to
perceive the same character of connection in the case
of a number of persons who merely agree, under pen-
alties, not to have dealings with another, because it
does not follow as a consequence that the non-enforce-
ment of the penalties, or even the abrogation of the
agreement, would restore the injured person to favor.

Nor can the law, lacking ability to perceive a
causal connection between the enforcement of the
by-laws in question in this case and the claimed inju-
rious consequence, open up an avenue of proof by
which the injury may be shown.   How can the plain-
tiffs prove that the defendants would trade with them,
were the latter not fearful of fine or expulsion from
their association?   They might prove that upon the

removal of the restrictive influences the defendants would trade generally on the market; but how can they prove that, among the hundreds of dealers on the market and the hundreds of daily transactions they have among themselves, an appreciable share of the denied trade would fall to them?

The defendants are not under contract to trade with plaintiffs, nor is it claimed that the making of a contract is desired by any of the parties, and that the enforcement of the by-laws operates to prevent the agreement. This is not the case of a union or association of persons intimidating its members from engaging in a specific service offered by an employer, and standing ready and open to be entered. In such cases, on a showing of continuing damage caused by inability to secure employees, preventive relief has been afforded. In this case, however, every element of injury lying at the base of plaintiffs' claim is indirect, remote, and conjectural, and our judgment therefore is that the relief asked cannot be allowed.

A great array of decisions has been marshaled before us, but nearly all of them bear on the question whether the defendant association is a monopoly, or whether its acts tend to monopoly. They also bear on the question whether the acts of the defendant association are in pursuance of a conspiracy to boycott the plaintiffs' in business. It was not difficult to make a showing of applicability of these decisions, because at first glance it would seem that the case required a consideration of the law relating to the subjects of boycotting and monopoly—one and, perhaps, both; but upon most careful reflection we are constrained to think that only the narrower question of interest of the plaintiffs in the subject-matter of the action is involved. There are no authorities bear-

ing directly on the precise subject.   The point in-volved is therefore one of first impression.

The case most nearly similar to it is *Russell v. New York Produce Exchange*, 58 N. Y. Supp. 842.   There the plaintiffs, who were not members of the exchange, sought to enjoin it from posting a notice declaring them guilty of certain charges, and also from prohib-iting its members from representing and acting for them on the floor of the exchange.   The relief asked was denied for reasons of a nature similar to those advanced by us in this case.   Another decision some-what supportive of the claim of lack of interest to maintain the action is *Bohn Manuf'g Co. v. Hollis*, 54 Minn. 223, 55 N. W. 1119, 21 L. R. A. 337, 40 Am. St. Rep. 319.   A case inclining somewhat toward the opposite view is *Boutwell v. Marr*, 71 Vt. 1, 42 Atl. 607, 43 L. R. A. 803, 76 Am. St. Rep. 746; but in reality none is sufficiently like the present one in point of fact to be especially helpful.

Nor do any of the statutes of this state aid the contention of the defendants in error, the plaintiffs be-low.   We have many statutory provisions condemna-tory of what are called "trusts" and "monopolies," but none of them gives a right of action in equity to individuals who do not on general equitable princi-ples already possess it.   For instance, section 2 of chapter 158, Laws of 1891, contains the following pro-vision :

"And it shall be unlawful for any person or per-sons or corporation or corporations doing business in this state to be or become a member of any society, association or corporation whose by-laws provide for and fix the minimum commission for the selling of live stock for others, or whose by-laws prohibit its members from purchasing live stock from persons who are not members of such society, association, or corporation," etc.   (Gen. Stat. 1901, §2440.)

This statute would seem to interdict membership in the defendant association, as long as it maintains the obnoxious by-laws in question, but it is entirely penal in character, as will be observed by its further reading. Its provisions are enforceable only by criminal prosecution. Equity does not give a private right of action to an individual for the doing of a wrongful act, merely because the statute has denounced the act as a crime. The enactment of a statute for the suppression of a public wrong does not vest in the individual a right of action to suppress it. If beforehand he had a right of action, the statute, when enacted, may illustrate or enlarge or strengthen it, but it does not give it, wholly and alone. Our conclusion is that the plaintiffs below have not shown any interest in the subject-matter of the action, nor do the findings of the court show that they possess any interest in it.

The judgment of the court below is therefore reversed, with directions to enter judgment on the findings in favor of the defendants.