NEW ENGLAND CEMENT GUN COMPANY *vs.* EDWARD J. MCGIVERN & others.

Suffolk.    January 26, 1914. — May 26, 1914.

Present: RUGG, C. J., LORING, SHELDON, DE COURCY, & CROSBY, JJ.

*Labor Union.    Unlawful Interference.    Damages,* In suit in equity.

If, in a suit in equity by a corporation, which was the exclusive licensee in a certain territory authorized to operate a machine for projecting through a hose a mixture of cement, sand and water called "gunite" upon walls, against the officers of a labor union, organized to unite all practical journeymen plasterers working within its locality "for the purpose of securing united action in whatever may be regarded as beneficial to their united interest," it appears that the defendants, in order to compel the plaintiff to employ only union men for operating the hose and "truing up" the work on all jobs where it used the machine, conspired together for the purpose of creating and enforcing a boycott against the plaintiff and of hindering and interfering with the prosecution of its business unless it should accede to their demands, sought out persons proposing to make contracts with it and coerced them into not doing so, caused the rescission of such contracts as they discovered had been made with the plaintiff, and, by means of a strike, compelled a certain contractor in charge of the plastering of a certain building, with whom they had no trade dispute, to compel the general contractor to compel the owner to compel the plaintiff to give them the work they demanded, an injunction will be issued restraining the defendants from causing or taking part in any boycott against the plaintiff's business by coercing others, through intimidation or threats, to withdraw from the plaintiff their beneficial business intercourse, and from causing or inciting any sympathetic strike against the plaintiff or its customers for the purpose of preventing the use by the plaintiff of its machinery and process of applying gunite or for the purpose of compelling it to discharge any of its non-union workmen.

In the same suit, a master found that, because of the acts of the defendants and in response to a letter from the owner of the building, the plaintiff assented to a cancellation of its contract, and that, "as a practical matter it was impossible for the plaintiff to hold its contract and impossible for the owner to allow the plaintiff to perform it, and the result of the action of the defendants was to destroy its value," and he further found that the profit which the plaintiff would have made if allowed to perform the contract was $890. The case being reserved for determination by this court, it was *held*, that, while the plaintiff was entitled to damages caused to its business by the unlawful acts of the defendants, the findings of the master were not sufficient to warrant an assessment of damages without a further hearing.

BILL IN EQUITY, filed in the Supreme Judicial Court on May 29, 1913, against "Edward J. McGivern . . . individually and as

an officer and member of a voluntary unincorporated association, to wit, The Operative Plasterers' International Association of the United States and Canada; and William C. Cumming, William J. Taylor, William C. Keating, and said Edward J. McGivern, individually and as officers and members of a voluntary unincorporated association, to wit, Union No. 10, Boston Branch, Operative Plasterers' International Association of the United States and Canada, and all other members of said Union No. 10, Boston Branch, most of whom are to the plaintiff unknown, and who are too numerous to be individually named as defendants in these proceedings." The bill sought to enjoin the defendants from interfering unlawfully with the plaintiff's business and for damages.

The suit was referred to Clarence H. Cooper, Esquire, as master. The material facts found by him are stated in the opinion. The case was reserved by *Sheldon*, J., for determination by the full court.

*W. M. Noble*, for the plaintiff.

*E. F. McClennen*, (*A. L. Fish* with him,) for the defendants.

DE COURCY, J. No exceptions were taken to the report of the master; and among the facts found by him are the following: The plaintiff is the exclusive licensee in New England of certain patented machinery and processes by which sand, cement and water are simultaneously mixed and projected upon the walls of buildings and other structures. The apparatus, which is called a cement gun, consists of a portable metal barrel with chambers and valves, in which dry cement and sand are mixed, divided into units of quantity, and then by means of an air compressor driven out of the gun and through a hose to the nozzle. A second hose conveys water into a chamber of this nozzle, and the elements are converted into a mixture or plaster called gunite, which is instantly ejected from the nozzle upon the surface to be covered. The apparatus is operated by two men, the gun man and the nozzle man. The gun man controls the valves which regulate the flow of the mixture into and through the gun, the pressure of air within the chambers, and the rate of discharge of the mixture from the gun and through the hose to the nozzle. The nozzle man holds and operates the nozzle, has charge of the hose and controls the flow of the water. He must be skilled in determining the angle

at which the plaster shall strike the surface; in judging and regulating the consistency, with respect to moisture, of the plaster which is being projected from the nozzle; and in determining the thickness and evenness of the coat of plaster which he is laying.

In a majority of cases it is necessary for the plaintiff to employ a skilled plasterer to follow the work of the gun and "true up" the surface of the cement. Operating the nozzle is very hard work, and it is the plaintiff's practice to have the nozzle man and the gun man interchange in their work at the end of each half day, for the purpose of resting each other; but if the nozzle man is a plasterer, then when the plasterer "truing up" the surface has learned the duties of nozzle man, the two plasterers can exchange places with the same result.

The defendants Cumming, Taylor and Keating are members of and respectively president, business agent and secretary of the Journeymen Plasterers' Benevolent Union of Boston, Mass., No. 10 of the International Association. McGivern is a member of the local union, and also president of the parent body, the Operative Plasterers' International Association of the United States and Canada, by which the local organization was chartered. The object of the local union, as defined in its constitution, is "to unite together all the practical journeymen plasterers working within the jurisdiction of this union for the purpose of securing united action in whatever may be regarded as beneficial to their united interest." And the master specifically finds that "one of the main objects of the International Association and of Union No. 10 is to exercise a control by concerted action over the relations of practical plasterers and those who may, from time to time, require their services."

In the autumn of 1912, the plaintiff was plastering with its process the exterior of an apartment house in Boston, when the defendant McGivern told the plaintiff's superintendent that he would have to employ union plasterers to operate the nozzle, or he (McGivern) would call a strike of the men working on the building; and for a time a union plasterer was so employed. On February 28, 1913, the plaintiff executed a written contract with the Old Colony Real Estate Trust to coat with gunite the exterior walls of a building which the Trust was erecting on Somerset and Howard Streets in Boston. While the preliminary

negotiations were going on the defendant Taylor asked the plaintiff's vice-president, one Ambursen, if the plaintiff was going to employ union men on the job, and on being answered in the negative, told him that if the plaintiff did the outside work on the building it would have to do the inside work also. About this time Taylor called on one Farley, who was the acting trustee for the Old Cólony Real Estate Trust, and said to him: "I understand you have got a contract with the New England Cement Gun Company. I would advise you not to go ahead and put that gunite on the building; if you do, there is liable to be trouble."

Early in April, when the interior plastering on the building in question was about one third done, the plasterers, all of whom were members of Union No. 10, left their work, and Taylor stated to Farley that unless he cancelled his contract with the plaintiff the plasterers would not return to their work. In order to induce them to return Farley, at Taylor's suggestion, wrote to one Caddigan, who was the general contractor on the building, notifying him that only union men should be employed in the work of covering the building with cement; and on the letter being given by Caddigan to Taylor the plasterers returned to work. A week later the union plasterers again left their work, and returned upon the assurance of Farley that none but union men would be employed on the outside of the building. Becoming suspicious of Farley's intentions, the union plasterers left their work a third time about ten days afterwards, the lathers and metal workers also leaving, and McGivern and Taylor refused to allow the plasterers to return to work until a contract had been made and exhibited to them, by which the builder had arranged for this outside work with Monahan, who had the contract for the inside plastering, and would employ union labor. Shortly before this the plaintiff's letter, later referred to, releasing the owner from its contract, had been sent to Farley, and by him shown to McGivern and Taylor.

It appears that Taylor, the business agent, was accustomed to make reports orally at the meetings of the Union. Their records, under date of April 16, 1913, contain the following: "B. A. made a report and the same was accepted as progressive. Moved no work be done on Monahan's job until the outside is started satisfactory to the business agent."

It does not appear that there is any dispute or contention between the plaintiff and its own employees, or that these employees are taking any part in the action of the defendants. The plaintiff's officers do not intentionally discriminate between union and non-union workmen, and were willing that their employees should join the defendant union. But, as the defendant McGivern informed them, this could not be done because the men were not plasterers; and he knew of no union to which they were eligible.

The master made certain specific findings and conclusions, among which are these.

"4. That there is a division of sentiment among members of the unions as to the use of the cement gun and process, the defendant McGivern and others being in favor of its use, and others in the majority being hostile to its use, based upon the fear that it will reduce the work of practical plasterers; that the present attitude of the local union officials is that the union should control the operation of the nozzle of the gun, and not the rest of the machinery; that the demand of the defendants is that the plaintiff employ skilled plasterers only, who are members of the union, to operate the nozzle, as well as to follow after the nozzle in smoothing the surface covered; that the object of the defendants is to compel the plaintiff to unionize its business and to run a closed shop so far as the work of plastering goes, in order to secure all of that work for the members of their union under union conditions; and that it was to accomplish this object that the strikes were called on the job upon the Howard Street building.

"5. That the defendants have conspired together for the purpose of creating and enforcing a boycott against the plaintiff and of hindering and interfering with the prosecution of its business and of injuring the same unless it accedes to their demands.

"6. That the defendants, in pursuance of said conspiracy, are engaged in watching and seeking out work proposed to be given to the plaintiff and in coercing those in control thereof not to make with the plaintiff any contract for such work, and in causing the rescission of such contracts as they discover to have been made with the plaintiff."

"8. That the strikes were strikes against a subcontractor for

the purpose of forcing him to coerce the main contractor to coerce the owner of the building to coerce the plaintiff to yield to the demands of the union.

"9. That the defendants have instituted a boycott against the plaintiff and intend to continue enforcing the same, unless prevented from so doing."

Without further recital of the details, it is apparent that the record discloses a combination on the part of the defendants to do acts which the law does not justify, notwithstanding that the ultimate motive by which they were inspired was to advance their own interests. The plaintiff had a written agreement with the owners of the building to apply the coating of gunite. Under our decisions it was unlawful for the defendants, by means of strikes and otherwise, intentionally to induce the owners to take away from the plaintiff its rights under that agreement. Such conduct is not legally allowable as so called trade competition or defense of self-interest. A combination to procure a breach of contract is an unlawful conspiracy at common law. *Berry* v. *Donovan,* 188 Mass. 353. *Folsom* v. *Lewis,* 208 Mass. 336. Further, if Monahan, who had the subcontract to do the interior plastering, also had the contract for this exterior work, his union workmen, unless prevented by their contract of employment, might have gone out on a strike unless he agreed to give all of the plastering work to them or their associates; because we assume that the application of stucco or cement to the exterior of a building may be found to be work such as practical plasterers have a right to compete for. But it was not lawful for them to strike to compel Monahan, with whom they had no trade dispute, to compel the general contractor to compel the owner to compel the plaintiff to give to the defendants the work they demanded. In other words, it was an unjustifiable interference with the plaintiff's business to injure others in order to compel them to coerce the plaintiff. Martin, Modern Law of Labor Unions, § 77 and cases cited. The acts of coercion and procuring breaches of contract mentioned in the sixth finding plainly are not justified by the law of this Commonwealth. It is unnecessary to consider further the unlawfulness of such a secondary or compound boycott in view of the full discussion of the subject in the recent opinions of this court in *Pickett* v. *Walsh,* 192 Mass. 572, and *Burnham* v.

*Dowd,* 217 Mass. 351, in which cases are collected the authorities in this and other jurisdictions.

The master finds that the International Association has not taken any action with respect to the use of the cement gun, and was not in any way concerned with the strikes referred to; and that the defendants McGivern and Taylor acted throughout as the agents and representatives of Union No. 10.

The plaintiff is entitled to a decree enjoining the defendants from causing or taking part in any boycott against the plaintiff's business, by coercing others, through intimidation or threats, to withdraw from the plaintiff their beneficial business intercourse; and from causing or inciting any sympathetic strike against the plaintiff or its customers for the purpose of preventing the use by the plaintiff of its machinery or process for applying gunite, or for the purpose of compelling it to discharge any of its non-union workmen; and to costs of suit.

As to damages. The only sum stated by the master is $890, which is the profit the plaintiff would have made if allowed to perform its contract with the Old Colony Real Estate Trust. It appears from the report that the plaintiff, in response to a letter from that Trust requesting a cancellation of the contract on account of the labor trouble, on April 9 wrote its assent thereto. As was said by Haney, J., in *Chipley* v. *Atkinson,* 23 Fla. 206, 220: "My own termination of a contract, whether with or against the will of my employer, cannot constitute a breach of it by him or create a ground of action against him, or one who has unsuccessfully endeavored to induce him to break it." But while the plaintiff has precluded itself from recovering damages for the breach of the contract as such, it may recover the damages caused to its business by the unlawful acts of the defendants. And in determining the amount to which it may be entitled the master may take into account, as stated in his seventh specific finding,*

* The seventh specific finding was as follows: "7. That the plaintiff, by practical force of circumstances caused by the acts of the defendants, was obliged to cancel its contract with the Old Colony Real Estate Trust; that the work upon the building could not have been carried forward any further until the plaintiff's contract was cancelled and a contract made with another person; and that, as a practical matter, it was impossible for the plaintiff to hold its contract and impossible for the owner to allow the plaintiff to perform it, and the result of the action of the defendants was to destroy its value."

that "as a practical matter, it was impossible for the plaintiff to hold its contract and impossible for the owner to allow the plaintiff to perform it, and the result of the action of the defendants was to destroy its value." It is to be borne in mind also that at the time of the correspondence referred to there was an understanding between the officers of the plaintiff and defendant companies that, if matters could be so adjusted that the work on the interior of the building would not be further interfered with, the contract for the exterior plastering would be re-awarded to the plaintiff. As the report now stands the court is not in a position to assess the damages, and the case must be recommitted for that purpose unless the plaintiff shall waive its claim therefor.

*Ordered accordingly.*