No. 22,068.

THE JARECKI MANUFACTURING COMPANY, *Appellant*, v.
A. E. MERRIAM, *Appellee*.

SYLLABUS BY THE COURT.

1. CUSTOM—*Requisites of a Good Custom.* The requisites of a good custom, invocable as tacitly affecting the rights and duties of parties to a contract, stated.

2. SAME—*Proof Required to Establish Custom—Preponderance of Evidence Insufficient* To establish the fact of the existence of such a custom, all the requisites must be proved by evidence which is clear and convincing, evidence of such cogency as to satisfy the mind and generate full belief, and a mere preponderance of the evidence is not sufficient.

3. SAME—*Competent Evidence to Establish Custom.* A witness having knowledge of the fact may testify directly to the existence of a good custom, subject to inquiry respecting the grounds upon which knowledge is predicated.

4. SAME—*Sale of Wire Cable—Custom to Make Adjustments with Purchasers for Defects not Proven.* The evidence examined, and held insufficient to establish the existence of a custom in the Butler county oil field for dealers in wire cables to make adjustments with purchasers of the price of defective cables, sold without warranty, after use has demonstrated their wearing quality.

Appeal from Butler district court; ALLISON T. AYRES, judge. Opinion filed April 12, 1919. Reversed.

*H. W. Schumacher,* of El Dorado, for the appellant.

*B. R. Leydig, K. M. Geddes,* and *E. W. Grant,* all of El Dorado, for the appellee.

The opinion of the court was delivered by

BURCH, J.: The action was one to recover the balance due on account for merchandise sold. Included in the account was the price of a wire cable. The defense was that the cable was not of good quality, did not perform the work expected of it, and that in such cases a custom existed in the Butler county oil field to make adjustment of the price, which the plaintiff refused to do. The defendant prevailed, and the plaintiff appeals.

Cables of the kind in question were articles of merchandise adapted to various uses, were kept in stock and sold by dealers, in reels, as they came from the manufacturers, and were not warranted by the dealers. There was evidence that a good cable, when used for drilling oil and gas wells, ought to drill substantially its length. It seems that quite a number of cables sold in the Butler county field, where the defendant operated as a drilling contractor, did not do this—probably on account of handicaps of the steel manufacturing industry imposed by the war. Some manufacturers, and some dealers by arrangement with the manufacturers, adopted a practice of "making good" their cables by adjustment of the price after wearing quality had been demonstrated by use. The plaintiff had not adopted the practice. The only adjustment it ever made was made with a drilling contractor, Roy Elliott, because of an overcharge. When the defendant complained of the cable in question, he told the plaintiff's manager that the Oil Well Supply Company, another dealer, had made adjustments for him on a fifty-fifty basis, and the plaintiff's manager said he would try to obtain an adjustment by the manufacturer of the cable. The manager testified that he sent to the manufacturer the pieces of the cable brought in by the defendant to prove its poor quality. The manufacturer passed the samples through all the tests, reported that the cable was up to standard, and refused to make any adjustment.

The cable handled by the plaintiff was manufactured by Broderick & Bascome. The defendant testified he knew dealers did not warrant cables, and that adjustments were made, not by the supply houses, but by the manufacturers. He knew of no adjustments having been made by Broderick & Bascome on lines sold by the plaintiff, but said the Broderick & Bascome

representative had made some adjustments. The Oil Well Supply Company, selling the Leishin cable, had made some adjustments for him, and he knew some adjustments had been made through the National Supply Company.

James Davis, J. L. Henderson, Roy Elliott, and C. E. Mills, drilling contractors in the Butler county field, and purchasers of cables, testified to the existence of a custom to make cables good by adjustment. Davis said he knew of no adjustments having been made by dealers in cables. He bought cables with the understanding—but without anything being said—that if they did not do a reasonable amount of work an adjustment would be made. He testified further, as follows:

"Q. You knew that when you bought your line or any line, that it was sold without warranty? A. No, sir.

"Q. Did your company that you bought your line from warrant it to you? A. Well, they sold it to me with the understanding that if it did not give satisfaction they would make an adjustment.

"Q. In other words, there was no custom; you relied upon that contract, did n't you? A. Yes, sir."

Testifying further with reference to the basis of adjustment, the witness said:

"I would judge that 100 feet of hole for every 100 feet of wire would be reasonable."

Henderson testified that he bought cables in carload lots from J. J. Prouty & Co., dealers at Parkersburg, W. Va., and had an understanding with them that they would make their cables good—that is, if the line did not do a reasonable amount of work, an adjustment of the price would be made. Adjustments had been made for him by the Oil Well Supply Company and by Prouty. He would notify Prouty, and Prouty would send a representative. He knew of other adjustments, but not by the plaintiff.

Elliott said he had an adjustment with the plaintiff, but that there was a mistake in the account. Before he purchased, he inquired if the plaintiff would stand back of its lines, and on being informed by the plaintiff's clerk that it would, he purchased on the strength of what the clerk said. Afterwards, the plaintiff's manager told him the clerk was without authority to say what he did. Elliott also testified he had an adjustment with the National Supply Company. The National Supply Company told him it would report to the manufacturer,

Manufacturing Co. v. Merriam.

and if the manufacturer would allow credit, he would get the benefit of it. He testified that the National Supply Company had made other adjustments. The method was for the supply company to notify the manufacturer, and if the manufacturer allowed credit, credit would be given.

Mills testified he had never had an adjustment in Butler county. He had heard of the Continental Supply Company making adjustments in different places, but not in Butler county. He knew nothing about the custom in the Butler county field.

No dealer in cables who knew it to be the settled, uniform and universal practice for dealers to make cables good by adjustment was produced as a witness for the defendant. On the other hand, the managers of five supply companies engaged in the business of selling cables, called as witnesses for the plaintiff, had no knowledge of any such custom. The manager of the Oil Well Supply Company said there was no established rule, but that his company had made adjustments. The manager of the National Supply Company said his company did not make adjustments. His company handled the Roglin cables, and the Roglins (manufacturers) had made one settlement. The manager of the Continental Supply Company said he knew of no usage or custom whereby his company was expected to make good, defects in the lines it sold. His company was not a manufacturer; it was simply a dealer, which purchased from the manufacturer. Drilling contractors knew the lines as well as the dealer, and the lines were sold without any warranty or guaranty whatever. The manager of the Frick-Reed Supply Company had been in business in El Dorado, in Butler county, for twenty months. He knew of no custom of making rebates for defective lines, and had never heard that such a custom existed before he came to El Dorado. The manager of the Atlas Supply Company testified that cables were used for hoisting, in bridge work, in mines, and in running machinery. Lines his company handled were sold without guaranty, and purchasers were required to sign receipts to that effect.

The court instructed the jury that the custom would be binding if established by a preponderance of the evidence.

Persons are presumed to contract with reference to a cus-

tom or usage which pertains to the subject of the contract.
(*Smythe v. Parsons,* 37 Kan. 79, 14 Pac. 444.)   To constitute
a custom which tacitly attends the obligation of a contract, the
habit, mode, or course of dealing in the particular trade, busi-
ness, or locality, must be definite and certain; must be well
settled and established; must be uniformly and universally
prevalent and observed; must be of general notoriety; and
must have been acquiesced in without contention or dispute so
long and so continuously that contracting parties either had
it in mind or ought to have had it in mind, and consequently
contracted, or presumptively contracted, with reference to it.
The requisites of a good custom must all be established by
evidence which is clear and convincing.   The very nature of
the subject is such it is not enough that the evidence on the
side of the existence of the custom merely preponderate—
merely overbalance in some degree the weight of evidence on
the other side.   It must be of such cogency as to satisfy the
mind and generate full belief.

"The court charged the jury that the custom may be established by the
preponderance of the evidence. In this there is error. . . . A custom
cannot be said to be an established one if it is in serious dispute and can
only be determined by carefully and nicely adjusting the scales to ascer-
tain which side preponderates.  The character and description of evidence
admissible for establishing the custom is *the fact* of a general usage and
practice prevailing in the particular trade or business, and not the
opinions of witnesses as to the fairness or reasonableness of it.  While
many early cases held that the custom could not be established by one
witness, this rule has been almost universally departed from.  It is never-
theless true that the custom must be proved by evidence sufficient to
satisfy the jury clearly and convincingly that such a usage existed as
can fairly be presumed to have entered into the intention of the parties
when they entered into the contract.  The character of the proof must be
clear, cogent, and convincing as to the antiquity, duration, and uni-
versality of the usage in the locality where it is claimed to exist.  . . .
Where the evidence is uncertain and contradictory, the custom is not es-
tablished, and the court should so instruct the jury." (*Penland v. Ingle,*
138 N. C. 456, Annotated Reprint, 367, 368.)

The *factum probandum,* existence of the custom relied on,
does not consist merely of isolated instances or occurrences.  It
is rather the comprehensive result of a series of similar in-
stances, satisfying the conditions necessary to a good custom,
and so may be testified to directly.   (3 Wigmore on Evidence,
§ 1954.)   The grounds of a witness' knowledge may, however,

be ascertained, and when the facts upon which knowledge assumes to rest are disclosed, the propriety of the inference or conclusion is disclosed.

In the case of *Scudder v. Bradbury,* 106 Mass. 422, the following illustrative instruction given the jury by the trial court was approved:

"It does not show a usage of trade to show that many persons, or a majority of persons, engaged in the business, practice in a particular mode. To constitute a usage of trade so as to have it affect the contract, the practice must be universal. If it is sometimes practiced and sometimes not, although it may be more frequently done than not done, that does not make what in law is a usage, which enters into and makes part of a contract. It must be *the* mode in which persons in that trade do their business. The usage must also be uniform. If different persons in the trade practice differently, it is not a usage, even though more persons practice one way than do another." (p. 424.)

Turning to the testimony of witnesses for the defendant, Davis had no knowledge of any instance in which the claimed custom had been practiced, and said there was no custom involved in his purchases, but an understanding with the seller, on which he relied. Henderson's knowledge was based on his own course of dealing with a foreign concern, and with the one local company which confessedly made adjustments. Elliott claimed he took an express warranty when he dealt with the plaintiff, and he absolved dealers from duty to allow credits unless the manufacturers allowed them. Mills knew nothing of any adjustments in Butler county. The defendant himself rested the duty to adjust and allow credit on the manufacturer and not on the seller, and so put his defense out of court. Statements of some of the witnesses, that they knew or had heard of other adjustments, were valueless because of the confusion in practice of both dealers and drillers, and for other obvious reasons. The result is, considering the defendant's evidence in the most favorable aspect, it failed to establish any single element of a good custom, binding the plaintiff to credit the defendant's account with any sum. It was impossible that there should be one practice for buyers and a different practice for sellers, and if the evidence on behalf of the plaintiff be given any credence whatever, the existence of the claimed custom was overwhelmingly disproved.

The writer would not suffer the custom to be recognized judicially, even if duly established. The effect of the custom

would be to attach a special kind of warranty to an ordinary sale of a common chattel manufactured and sold for general use, contrary to the settled law of sales. In the writer's judgment, the rules of law governing common commercial transactions ought themselves to be certain, uniform, and universal, and not subject to local or particular exception. In the case of *Clark v. Allaman*, 71 Kan. 206, 231, 80 Pac. 571, this court considered the function of usage and custom, and reached the conclusion that evidence of local customs, contrary to established principles of law, may not be received. In the case of *Hopper v. Sage*, 112 N. Y. 530, Mr. Justice Peckham, speaking for the court, said:

"Usage and custom cannot be proved to contravene a rule of law or to alter or contradict the express or implied terms of a contract free from ambiguity, or to make the legal rights or liabilities of the parties to a contract other than they are by the terms thereof." (p. 535.)

In Cooley's note to Blackstone's discussion of the subject of particular customs may be found the following pertinent observations:

"The most serious question pertaining to usages is, whether they are admissible in any case when they oppose or alter a general principle or rule of law, and upon a fixed state of facts would make the legal rights or liabilities of the parties other than they are by the common law. We think we are justified by the authorities in answering this question in the negative. 'Nothing,' says Ch. J. Gibson, 'should be more pertinaciously resisted than those attempts to transfer the functions of the judge to the witnesses' stand, by evidence of customs in derogation of the general law, that would involve the responsibilities of the parties in rules whose existence, perhaps, they had no reason to suspect before they came to be applied to their rights.' (*Boulton v. Colder*, 1 Watts, 360.) . . . 'Though usage,' said Ch. J. Kent, 'is often resorted to for explanation of commercial instruments, it never is, nor ought to be, received to contradict a settled rule of commercial law.' (*Frith v. Barker*, 2 Johns, 335.) . . . A commercial usage is a long and uniform practice, applied to habits, modes, and courses of dealing. It relates to modes of action, and does not comprehend the mere adoption of certain peculiar doctrines or rules of law. It may operate to give effect to contracts different from that which the common law would have done, but the consequent variation of the legal rights of the parties is only the result of a mode of dealing. The adoption, however, of a mere doctrine as to the rights and obligations of the parties under a contract, which doctrine is contrary to the rule of the common law on the subject, as, for instance, that a warranty should be implied in a sale of chattels where the common law implied none: *Barnard v. Kellogg*, 10 Wall. 383; *Beckwith*

Henderson v. Petroleum Co.

*v. Farnum,* 5 R. I. 230; *Coxe v. Heisley,* 19 Penn. St. 243; *Wetherill v. Neilson,* 20 Penn. St. 448; *Dickinson v. Gay,* 7 Allen, 29; *Tremble v. Crowell,* 17 Mich. 493; or that a warranty should not exist where the common law implies one: *Whitmore v. South Boston Iron Co.,* 2 Allen, 52; is beyond the province of a commercial usage. The distinction has been well said to be somewhat nice: per Chapman, J., in *Dickinson v. Gay,* 7 Allen, 37; and it certainly has not always been kept in view; but it is believed to be sound, and, if adhered to, will tend to uniformity in the law, and to protect parties against usages of uncertain character and doubtful propriety." (Cooley's Blackstone, 4th ed., bottom p. 70 [\*77].)

The court has not deemed it necessary to decide this very important question in this case.

The judgment of the district court is reversed, and the cause is remanded with direction to enter judgment for the plaintiff.