No. 37,942

Radio Station KFH Company, *Appellant,* v. Musicians Association, Local No. 297, American Federation of Musicians, et al., *Appellees.*

(220 P. 2d 199)

Opinion filed July 8, 1950.

*Howard T. Fleeson,* of Wichita, argued the cause, and *Homer V. Gooing, Wayne Coulson, Paul R. Kitch, Dale M. Stucky* and *Donald R. Newkirk,* all of Wichita, were with him on the briefs for the appellant.

*Vincent F. Hiebsch,* of Wichita, argued the cause, and *Milton Zacharias, Kenneth H. Hiebsch, J. R. Sheedy, Lester C. Arvin, Yale W. Gifford,* all of Wichita, and *Henry Kaiser,* of Washington, D. C., were on the briefs for the appellees.

The opinion of the court was delivered by

Wertz, J.: This is an appeal from a ruling sustaining defendants' demurrers to the pleadings and evidence in an action to enjoin defendant labor unions from interfering with the contractual relationship subsisting between appellant and certain of its employees, members of appellee union and fellow tradesmen of the members of appellee association, Local No. 297.

The record discloses that appellant, Radio Station KFH Company, hereafter referred to as KFH, on October 11, 1949, filed its petition

to restrain appellees from interfering with the contractual relationship existing between KFH and certain named employees, and from doing any act prejudicing those employees in their relationship with the appellee labor organizations. On the same day KFH obtained an *ex parte* restraining order which enjoined the international and local groups from doing any act directly or indirectly interfering with the contractual and employment relationship between KFH and the named employees and further enjoined any act directly or indirectly to the prejudice of the employees as members in good standing of the appellee, the American Federation of Musicians. The appellee, Local No. 297, and persons acting upon its behalf were restrained pending the hearing for a temporary injunction from acting or purporting to act with respect to the issuance of membership cards, work permits, or any other evidence of rights granted by the labor organizations in Kansas. An order for a hearing for a temporary injunction was made in conjunction with the *ex parte* restraining order. KFH, in its petition for a perpetual injunction—disregarding the purely formal allegations—alleged it had sponsored various groups of musicians who have been known in Wichita and adjacent trade territory as the Ark Valley Boys, and that name is well known throughout the states of Kansas and Oklahoma; that the name "Ark Valley Boys" has been promoted throughout Kansas at great expense incurred through newspaper advertising, radio announcements, window cards and personal appearances. On September 23, 1949, KFH was notified by the six members of the group then constituting the Ark Valley Boys that they were resigning, effective October 7, 1949; that upon receipt of the notice the manager of the radio station, desiring to obtain union musicians, called upon the local organization for names of its members available for such placement who were similar in character, or as known to the trade, "folk musicians, western and hillbilly," although no contractual relationship existed between KFH and the union. The local informed KFH that it was unable to make replacement of the type and character desired. Thereupon the radio station contacted one Tex Ferguson in St. Joseph, Mo., a member in good standing with the American Federation of Musicians, and a member in good standing of its local No. 50. Arrangements were made for the appearance of Ferguson and his group of four other musicians in Wichita on the programs of the station under the name of the Ark Valley Boys. The Ferguson group arrived in Wichita October 9, and the following morning presented their transfer cards to an officer

of Local 297, in accord .with the usual practice and custom of the association, and offered to pay ten percent of the local scale to the local chapter or to join outright on a transfer basis. The officer refused to honor the transfer cards and refused to permit the Ferguson group to accept the engagement and threatened them with fines and suspension by the American Federation of Musicians, thus coercing and intimidating the Ferguson group in the enjoyment of their legal rights; that as a result of the threats and coercion the Ferguson group refused to fulfill their contractual obligations with KFH. It was further alleged that the labor organizations had not complied with the pertinent sections of chapter 44, G. S. 1947 Supp., which provide for the licensing of certain officials of labor organizations· and the filing of the constitutions of and reports by those organizations; that by reason of the described acts the labor organizations are coercing and intimidating the employees of KFH in the enjoyment of their legal rights and are discriminating against them in violation of G. S. 1947 Supp., 44-809 (14) ; that the violations by the labor organizations of the laws of the state of Kansas are causing irreparable damage to KFH and it is without an adequate remedy at law. Allegations were also made to the effect that the labor organization by its acts was preventing KFH from fulfilling its contractual obligations with advertisers and sponsors. A prayer for relief followed as previously set out herein.

The defendant American Federation of Musicians appeared specially and moved to quash the service and was overruled; the defendant Local 297 filed a motion to dissolve the *ex parte* restraining order, which was modified by the district court in respect to the order's effect upon the local's power to act on behalf of its members and in connection with the issuance of membership cards, work permits and other evidence of rights granted by labor organizations.

Answers in the form of general denials were filed by all defendants. Plaintiff's petition was filed on October 11, 1949, alleging that the defendants had failed to comply with the pertinent statutes, G. S. 1947 Supp., 44-804, *et seq.* Subsequent thereto and on October 17, the defendants complied with the mentioned statutes and on the 19th day of October, motions to dissolve the temporary restraining order and motions to quash the summons were heard and the order was modified as heretofore related. The case was heard on plaintiff's petition for a temporary injunction on November 21, 1949, and after the matter was fully presented, the defendants interposed demurrers to the evidence which were sustained by the court.

A brief review of plaintiff's evidence discloses that appellant's manager of promotion and publicity had been connected with appellant radio station for nineteen years and had been a member in good standing of the American Federation of Musicians since 1913; that at considerable expense it had since 1939 sponsored and promoted a group of musicians and entertainers under the copyrighted name of "Ark Valley Boys" whose membership fluctuated from time to time and whose performance was in the nature of a hillbilly band. On September 23 the personnel then comprising the group tendered its resignation to the appellant. The station was under no contract to hire members of the union, but its practice was to hire only musicians who were union members in deference to the station's musical director who was a member of the union. Upon the resignation of its current "Ark Valley Boys," appellant contacted the local labor organization with respect to similar groups of performers who might be available; one group was suggested but was not available for full-time employment, and appellant was advised there were no others in the jurisdiction. He then contacted a group of performers in St. Joseph, Mo., who were members of defendant union, and asked them to come to Wichita; they arrived on Sunday, October 9, and were hired on a six-months contract to start with a performance the following morning as the "Ark Valley Boys." After the initial broadcast on October 10, the performers went to the office of the local union to deposit their transfer cards, and were there advised the cards would not be accepted, that each member would be subject to a fine of $1,000 if they remained in Wichita; that they would have to be in Wichita for six months before they could work and now that they had played a program they could be suspended from working for twelve months, all being under provisions of the union bylaws and constitution, introduced in evidence and pertinent provisions of which are as follows:

Article 14, section 8: A member cannot, before depositing his transfer card with a Local and before obtaining the quarterly due card from the Secretary of same, solicit, accept or fill an engagement in the jurisdiction of a Local unless it is otherwise provided for by the laws of the Federation.

Article 14, section 9: A member who has his transfer card on deposit in a Local is not entitled, without the consent of the Local, to solicit, accept or play any steady engagement, nor can he substitute on such engagement, during a period of three months after the date of deposit and where a Local maintains a law defining a steady engagement as one consisting of three or more days per week, for one particular employer, for two or more consecutive weeks, then transfer members coming within the provisions of this paragraph cannot, with-

out the consent of the Local, accept such steady engagement, nor can they substitute on such engagement, for a period of three months from date of depositing transfer card; but otherwise he is entitled to all privileges of the Local, including voice, but not to vote or hold office, but said member shall not be entitled to any sick or death benefits or full membership until the full amount of the initiation fee as provided in the Constitution and By-Laws of the said Local has been paid.

Article 2. *Object.* The object of the American Federation of Musicians shall be to unite all local unions of musicians, the individual musicians who form such local unions of the American Federation of Musicians into one grand organization for the purpose of general protection and advancement of their interests and for the purpose of enforcing good faith and fair dealing, as well as consistency with union principles, in all cases involving or of interest to members and Local Unions or the Federation.

Other sections of the bylaws provide for procedure in hearings and trials and the imposition of penalties upon the member found guilty of violation.

The transfer cards presented by the members had endorsed upon the backs thereof the substance of the first two bylaws set out above. The members were also told by the business manager of the local union that under the bylaws they would be subject to fine and other punishment for their acts. However, no formal charges were preferred or filed against them in accordance with the bylaws. Immediately after the transfer cards were refused by the local union, Ferguson and other members of the band returned to appellant station and stated they were leaving Wichita; that they could not fulfill their contract with the station because they wanted "to stay in good standing with the union . . . wanted to be a member. You have to be a member to work . . . From my experience, you can't work unless you carry a card." Ferguson further testified: "In my nine years of playing as a musician I have traveled in a lot of states. I have always had to go to the local where I was working and get a transfer to where I was going to move to, and there were no questions asked. If I lived there any length of time I took my card in and showed them I was in good standing; showed them I had a transfer. Most of the time I would work a week and then go down. I have never had a reception like I got in this local in all my nine years of playing." And on cross-examination he testified: "I am familiar with the fact that the American Federation of Musicians have constitutions and bylaws which govern the operations of the union. To some extent I am familiar with them."

There was testimony to the effect that KFH had spent consid-

erable money in advertising and sponsoring the "Ark Valley Boys"; that they had contracts to fulfill with local and national advertisers; and that the contract between KFH and the Ark Valley Boys was of great value to the station.

It is well settled that upon a demurrer to plaintiff's evidence, his petition and evidence are accepted as true and will be construed favorably for the plaintiff. It remains then to ascertain whether plaintiff here, in the light of this favorable construction, has stated a cause of action for injunctive relief.

Many questions are raised by appellant on this appeal. However, for the sake of brevity they may be summed up as follows:

1. Can a party aggrieved at the action of a voluntary association, which action so far as direct effect is concerned expends itself wholly upon the members of the association, interfere in the internal management and discipline of the association to prevent such action because of the indirect injurious effect it has on the aggrieved party? Under the facts in the instant case, we think not.

No real purpose would be served by an extensive review of the history of the labor movement in the state of Kansas. It is sufficient to say that its progress has been charged with difficulty and, recently, touched with some degree of success. In the face of economic and social pressures, labor and its organizations have attained a status equivalent to that of other voluntary associations and organizations; their purposes and objectives have been recognized and classified, and it is the rule today that when the purposes and objectives of labor organizations are otherwise lawful, though they have the effect of inducing breaches of contract between employer and employee or employer and customer, the public interest in improving working conditions is of sufficient social importance to justify such peaceful labor tactics. (*Imperial Ice Co. v. Rossier*, 18 Cal. 2d 33, 112 P. 2d 631; *Parkinson Co. v. Bldg. Trades Council*, 154 Cal. 581, 98 Pac. 1027, 21 L. R. A. (NS) 550; *Pierce v. Stablemen's Union*, 156 Cal. 70, 103 Pac. 324; *O'Keefe v. Local 463 of Assn. of Plumbers*, 277 N. Y. 300, 14 N. E. 2d 77; *Cline v. Insurance Exchange of Houston*, Tex. Civ. App., 154 S. W. 2d 491; affirmed in 140 Tex. 175, 166 S. W. 2d 677.)

It is settled doctrine that injuries remote and indirectly attributable to an originating cause cannot be made the subject of a legal action. (*Downes v. Bennett*, 63 Kan. 653, 66 Pac. 623.)

The law gives the defendants a right to sell their labor to whom they please, when and under such conditions as they may fix, indi-

vidually or in combination. They may make rules and regulations, passed in good faith, providing for what they deem to be an economic advantage to themselves. If, in the enforcement of such rules and regulations they violate no law, but act solely for the declared purpose, the courts ought not and cannot legally enjoin them from such concerted action, simply because such action may affect some employers. (*H. Lipman & Sons, Inc., v. Brotherhood*, 63 Ohio App. 157, 25 N. E. 2d 853.) The articles of agreement of a benevolent association, whether called a constitution, charter, bylaws or any other name, constitutes a contract between the members which the courts will enforce if not immoral or contrary to public policy or the law of the land. (*Brown v. Stoerkel*, 74 Mich. 269, 41 N. W. 921, 3 L. R. A. 430, quoted with approval in *McLaughlin v. Wall*, 86 Kan. 45, 119 Pac. 541. See, also, 7 C. J. S. 33, § 11a; *Lake of the Forest Club v. Buttles*, 142 Kan. 538, 51 P. 2d 18; *Bush v. International Alliance*, 55 Cal. App. 2d 357, 130 P. 2d 788.)

Voluntary associations have the right to make their own regulations as to admission or expulsion of members, and one who becomes a member assents, by his membership, to the constitution and rules of procedure adopted by such an association. The constitution, rules and bylaws, knowingly assented to, become in effect a civil contract between the parties whereby their rights are fixed and measured. The constitution, rules and bylaws of a voluntary, unincorporated association constitute a "contract" between the association and its members and the rights and duties of the members as between themselves and in their relation to the association in all matters affecting its internal government and the management of its affairs are measured by the terms of such constitution and bylaws. (*Bush v. International Alliance*, supra; *State of North Dakota v. North Central Ass'n, etc.*, 236 Fed. Supp. 694; *Grand International Brotherhood, etc., v. Couch*, 236 Ala. 611, 184 So. 173.)

In the instant case it is obvious that the pertinent provisions of the constitution and bylaws of the appellee organizations are not immoral or unlawful; we cannot say they are contrary to public policy. We do not now decide that the exercise or application of appellees' bylaws and rules of procedure governing its power to discipline its members meets the requirements of the public policy of the state of Kansas. That question is not before us; there is nothing in the record to suggest that any action, other than a threat of expulsion and fine, was taken on behalf of the appellee, and that

threat was made by an officer incapable of carrying it out under the pertinent bylaws and rules of procedure of the union. Appellant's employees were free either to carry out their oral agreement with the appellant and accept the disciplinary action provided for by the bylaws of the union, or to comply with the terms of their agreement with the union in respect to employment in the jurisdiction of Local No. 297. It is true that a witness testified to the effect that to secure employment it is necessary to be a member of the union. That is a so-called "fact of life" that we in organized society must accept. Certainly it has long been recognized that organization is a legitimate labor objective and the enforcement of the bylaws of a labor organization, if not illegal, immoral or contrary to public policy, is a reasonable corollary of that objective.

2. Appellant justifies its employees' action in not presenting their membership cards to the local union for transfer prior to the time of any performance and the making of a contract, on the plea of custom in contravention of the bylaws. Ferguson testified that in other states he was permitted to engage in performances and make contracts prior to presenting to the local unions his card for transfer. He further testified he had no previous experience in making membership transfers in Kansas. We have held that to constitute a custom which tacitly attends the obligation of a contract, the habit, mode or course of dealing in the particular trade, business or locality, must be definite and certain; must be well settled and established; must be uniformly and universally prevalent and observed; must be of general notoriety; and must have been acquiesced in without contention or dispute so long and so continuously that contracting parties either had it in mind or ought to have had it in mind, and consequently contracted, or presumptively contracted, with reference to it. The requisites of a good custom must all be established by evidence which is clear and convincing. The very nature of the subject is such it is not enough that the evidence on the side of the existence of the custom merely preponderate—merely overbalance in some degree the weight of evidence on the other side. It must be of such cogency as to satisfy the mind and generate full belief. (*Manufacturing Co. v. Merriam,* 104 Kan. 646, 180 Pac. 224.) In order that it may be binding, a custom or usage must be known to the party sought to be charged or must be so notorious that knowledge of it will be presumed. (*McSherry v. Blanchfield,* 68 Kan. 310, 75 Pac. 121.) The evidence construed in its most

favorable light does not bring appellant within the mentioned rule.

Appellant cites many cases in support of his invocation of the injunctive process; all may be distinguished upon the facts. In *Imperial Ice Co. v. Rossier*, supra, an injunction was issued to restrain a competitor from inducing one who had contracted with plaintiff to refrain from engaging in the ice business in a specified area to breach that contract. There it was said that the interest of labor in labor conditions was sufficient justification for the inducement of a breach of contract by otherwise lawful means. In *California G. C. Bd. v. California P. Corp.*, 4 Cal. App. 2d 242, 40 P. 2d 846, an injunction was granted restraining defendant competitor from inducing signatories of an agreement with plaintiff which contemplated the purchase and sale of grapes to breach the agreement. In *American Guild of Musical Artists v. Petrillo*, 286 N. Y. 226, 36 N. E. 2d 123, the controversy was between two labor groups and an injunction restraining defendant from exercising sanctions against the member of the rival group was affirmed. In *New England Cement Gun Co. v. McGivern*, 218 Mass. 198, 105 N. E. 885, an injunction was granted restraining a union from applying sanctions against an employer. That rule was followed in *Harper v. Brennan*, 311 Mich. 489, 18 N. W. 2d 905. *Martin v. Luster*, 85 F. 2d 833, cited by appellant, is completely irrelevant. *Shine v. Fox Bros. Mfg. Co.*, 156 Fed. 357, in which the union was enjoined from sanctions against third parties, was decided in 1907, and is not the law today. *Auburn Draying Co. v. Wardell*, 227 N. Y. 1, 124 N. E. 97, decided in 1919, is subject to the same criticism as the Shine case, *supra*.

Appellant cites the case of *Russell v. Bovard*, 153 Kan. 729, 113 P. 2d 1064, as authority for the proposition that it is tortious conduct to induce one to breach a contract with another. The court announced the rule in its syllabus but made an important qualification; to quote: "Generally it is an actionable wrong for a third person *without justification* to induce one to breach a contract . . ." (Emphasis supplied.) To restate the instant case briefly: Appellant alleges that the appellee induced Ferguson to breach his contract with appellant; to fall within the rule sought for, it must be assumed that appellee was without justification. The record discloses that Ferguson was a member in good standing of the union; a voluntary association, and therefore bound contractually by its constitution and bylaws. The contract he made with appellant constituted a breach of his prior contract with the union. Can it be said that the union is not justified in invoking, or rather threatening to invoke,

the penal clauses of its contract with Ferguson? We think not; upon review of authorities cited by appellant we find nothing that would lead us to reach a different conclusion.

In view of the foregoing, it is apparent that appellant has failed to state and prove a cause of action for injunctive relief, and the judgment of the trial court should be affirmed.

WEDELL, J., dissents.

HARVEY, C. J. (dissenting): On October 10, 1949, when the incidents occurred which gave rise to this action, and on the next day when the action was filed and the restraining order issued, the Musicians Association, Local No. 297, and H. Kenneth Watson, its secretary and business agent, and the American Federation of Musicians, were not legally transacting business in Kansas for the reason that the associations had not complied with our statute (G. S. 1947 Supp. 44-805) and Watson had not been licensed as a business agent of Local No. 297, as required by G. S. 1947 Supp. 44-804. This statute (§ 44-809) made it unlawful for any person (7) "To act as a business agent without having obtained and possessing a valid and subsisting license"; and (10) "To act as a business agent or representative of any labor organization which does not have on file, with the secretary of state, its constitution and bylaws"; and section 44-814 makes the violation of the statute by any person or labor organization a misdemeanor and fixes the penalty therefor. This statute was upheld in these particulars in the case of *Stapleton v. Mitchell*, 60 F. Supp. 51, and the appeal in that case was dismissed by the United States Supreme Court (326 U. S. 690; 90 L. ed. 406; 66 S. Ct. 172). The facts were stipulated upon the trial of this case in the court below that the statute had been violated. In this situation defendants are not in good position to rely upon their constitution and bylaws, or upon the acts of the business agent of Local No. 297, as a defense to a suit in a court of equity. It may be conceded that these associations may make reasonable rules respecting their organizations and their members who voluntarily join them, but they should be as meticulous in conforming to the laws of our state when they undertake to do business here as they expect their members to be in conforming to their rules. It is true they later conformed to our statute in those particulars, but not until after the damage had been done to Ferguson and the other members of his group and to the plaintiff in this action; hence, it is too late as far as this case is concerned.

The conduct of the defendant Watson, which the defendants, Musicians Association and American Federation of Musicians, attempted to support, can hardly be regarded as just and equitable under the constitution and bylaws of the American Federation of Musicians set forth in the abstract. Article 14, dealing with transfers, section 8, does provide that the member should deposit his transfer card and obtain his quarterly dues card from the secretary before he solicits, accepts or fills an engagement in the local jurisdiction. This rule is subject to certain exceptions, not specified in the rules. It may be conceded there was a technical violation of the rule, but the undisputed testimony at the trial was that it was not always adhered to strictly; that frequently circumstances would make it inconvenient if not impossible for that to be done before an engagement was filled, even though it might be several days. Here Ferguson and his group arrived in Wichita late Sunday night, October 9. They had an engagement to fill the next morning, with preparations to make. Without taking time even to get a place to stay they prepared and filled the engagement and promptly went· to the office of Watson, the acting business manager of Local No. 297, presented their transfer card, and offered to pay whatever was required. There is no complaint that this offer was inadequate. It would seem that at most only a reprimand or minimum fine should have been imposed. Under section 9 it appears the local had authority to consent to the transfer member taking even steady employment at once. Even if that consent were not given he was entitled to certain privileges in the local, and section 10 makes it clear that "No local has the right to deny full membership to a transfer member; it may, however, refuse full membership before the expiration of six months from the date of deposit of transfer card." In short, the bylaws leave plenty of room for equitable and just treatment of a transfer member. Ferguson and his associates got the opposite kind of treatment from Watson. They were told they would be fined a thousand dollars each. Of course Watson had no authority to fine them any sum. That is conceded in the brief and arguments here. They were also told that they could not perform in the local jurisdiction for six months. Watson had no authority to make any decision of that kind. They were also threatened with the loss of membership in the American Federation of Musicians. It is my judgment that this type of conduct should not be condoned by courts of equity. The judgment of the trial court should be reversed.