COLLIS LOVELY & others *vs.* AUSTIN E. GILL & others.

KNIPE BROS., INC. *vs.* GEORGE WHITE & others.

Essex. March 14, 1923. — June 11, 1923.

Present: RUGG, C.J., BRALEY, DECOURCY, CROSBY, & PIERCE, JJ.

*Labor and Labor Union. Strike. Evidence,* Extrinsic affecting writing. *Equity Jurisdiction,* Specific performance, To enjoin unlawful interference. *Unlawful Interference. Contract,* Validity. *Equity Pleading and Practice,* Parties, Decree. *Restraint of Trade. Monopoly.*

A suit in equity by a labor union against a shoe manufacturer to require specific performance of an alleged " verbal and written agreement " to continue certain provisions of an expired agreement as to relations, other than

wages, between the defendant and the plaintiffs cannot be maintained, where it appears that a new contract in writing was made which continued in effect certain price scales after the expiration of the former agreement " until the signing of a new list," but which made no mention of the provisions in the old agreement as to relations, other than wages, between the defendant and the plaintiffs.

An agreement in writing between a labor union and a manufacturer, which merely continued a wage scale stated in an expired agreement " until the signing of a new list," cannot be varied nor extended by an alleged oral agreement that other provisions of the expired contract concerning working conditions also should be continued.

In a suit in equity by a labor union to require a manufacturer to carry out the provisions of a " closed shop agreement," wherein the defendant agreed to hire only members of the union and it was provided that, if such members were not available, he could employ other persons until such time as union men were available if notice was given to non-union employees that they were hired subject to such conditions, it was *held*, that a mandatory injunction compelling the defendant to employ only union workers in accordance with the agreement should not be issued where the union admits that it cannot furnish union workers.

Upon demurrer to a bill in equity by a labor union against a rival labor union and an employer of labor to enjoin the defendant union from knowingly inducing or coercing the defendant employer by threats and intimidation to join a conspiracy to ruin the plaintiff union by repudiating a " union stamp " and " closed shop " agreement, it was *held*, that

(1) The bill was maintainable to restrain alleged acts of the defendant union, done, not under an alleged right to strike for the protection of their industrial or economic interests, but in an endeavor to destroy the individual rights of fellow workmen unless they submitted to the defendant union's dictation and control;

(2) There was no complete and adequate remedy at law giving the relief sought by the bill;

(3) The bill was not multifarious;

(4) The allegations of the bill were not so vague and indefinite that the defendants were not sufficiently informed of the nature of the complaint to enable them to make their defence;

(5) Specific performance not being asked by the bill, no question of mutuality of obligation or of remedy was involved;

(6) The bill was correct as to parties, the named plaintiffs and defendants being alleged adequately to represent the numerous members of their respective unions;

(7) The authority of the officers executing the contract and its validity were not open to attack by the members of the defendant union, who were not parties to the contract and claimed no benefit under it;

(8) Upon the record, comprising the bill and the demurrer, it could not be said as a matter of law that a federal question was involved nor that the " union stamp " and " closed shop " agreement was in restraint of trade either at common law or under statutory provisions.

The " union stamp " involved in the contract above described was not a trading stamp, the control of which, in certain conditions, might result in a monopoly.

While it might be that there were certain provisions in the above described "union stamp" and "closed shop" agreement which a court of equity in its discretion would not enforce by specific performance, the fact that such relief might be denied if sought by one of the parties did not make the entire contract illegal or voidable in the suit above described.

It was *held*, that the "union stamp" and "closed shop" agreement, upon the allegations in the bill above described and in the absence of further allegations or of evidence, could not be considered, in so far as it related to the exclusive employment of union labor, as illegal because tending to foster a monopoly or to violate 26 U. S. St. 209, c. 647, or G. L. c. 93.

An arbitration clause in the contract above described did not make it invalid.

It not appearing from the allegations of the bill that in all the circumstances the "union stamp" and "closed shop" agreement was entered into for the sole purpose of unjustifiably stifling competition and preventing the free flow of labor, the demurrer could not be sustained, even if at a subsequent trial on the merits such facts might be disclosed.

The alleged "union stamp" and "closed shop" agreement was for the benefit of all the members of the plaintiff union, and, therefore, *it seems* that, even if some of them joined with the defendants in the conspiracy to wrong the plaintiffs, or if they were not included in the suit, or if, as to them, the suit should be discontinued, the other members of the plaintiff should not be deprived of their individual rights against the defendants, who should not be permitted to take advantage of their wrongdoing in procuring the abandonment of work by the company's employees for the purpose of accomplishing an abrogation of the contract, as stated in the bill.

On an appeal from a decree in a suit in equity based on a finding by a judge who heard the suit, the finding must stand if the evidence is not reported.

If a labor union causes thirty of its members to leave the employment of a manufacturer, who also employs one hundred and eighty members of a second labor union, a rival of the first in the same locality with whom the manufacturer has a "union stamp" and "closed shop" agreement, and pickets the manufacturer's plant for the purpose of inducing and forcing his other employees to leave his employment in breach of the agreement made with the second union and to compel the manufacturer to employ only members of the first union, such strike is unjustifiable and may be enjoined in a suit in equity by the manufacturer.

If, in such a suit in equity, it appeared that among those joined as defendants are some members of the union with whom the manufacturer had the "union stamp" and "closed shop" agreement, and that they joined in the unlawful acts of the defendant union, they also may be made subject to the injunction.

A final decree in the suit above described was too broad because it enjoined acts not alleged in the bill; and, upon an appeal by the defendant, it was modified to conform to the allegations in the bill and, as modified, was affirmed.

BILL IN EQUITY, filed in the Supreme Judicial Court for the county of Suffolk on May 5, 1922, and afterwards amended, by one describing himself as "a member of and the general business agent of the Shoe Workers Protective Union, which

is a voluntary unincorporated association having a usual place of business in Haverhill in the county of Essex and is composed of workers of the various branches of the shoe-making industry, and that he brings this bill for and on behalf of the Shoe Workers Protective Union and its members, and by their authority." The defendant was a manufacturer of shoes in Haverhill. The plaintiff sought to enjoin the defendant from violating the terms of an alleged " verbal and written agreement " containing the provisions of a " closed shop " agreement described in the opinion. There also was a prayer for an accounting as to damages caused to the plaintiffs by the defendant. Also a

BILL IN EQUITY, filed in the Superior Court on October 9, 1922, and afterwards amended, by two persons who alleged that they were " General President and General Secretary-Treasurer respectively and members of a voluntary unincorporated labor organization known as the Boot and Shoe Workers' Union, which comprises thousands of members whose interests are common with those of the plaintiff and who will be fairly and fully represented without being joined as named parties, and that this bill is brought in behalf of all of the members of the said Boot and Shoe Workers' Union." The defendants were, first, a group of " members of a voluntary unincorporated association known as the Shoe Workers' Protective Union, which union comprises thousands of members the names of most of them being unknown to the plaintiffs," the plaintiffs alleging that " it is difficult and impracticable to bring them all before the court, but their interests involved in this suit are common with those of the defendants named, and they will be fairly and fully represented without being joined as named parties;" second, the members of a copartnership doing business under the firm name, Triangle Shoe Company, and, third, a national bank, funds in which the plaintiffs sought to reach by trustee process to enforce their claim for damages. Material allegations and prayers of the bill are described in the opinion. Also a

BILL IN EQUITY, filed in the Superior Court on November, 7, 1922, by a corporation engaged in Haverhill in the manu-

facture of shoes against two groups of defendants, the first being described as " members of a voluntary unincorporated labor organization known as the Shoe Workers' Protective Union, which union comprises many more than a majority of all the shoe workers in said Haverhill, and are many thousands in number, the names of most of them . . . [being] unknown to the plaintiff," the plaintiff alleging that " it is difficult and impracticable to bring them all before the court; their interests involved in this suit are common with those of the named defendants, and they will be fairly and fully represented without being joined as named parties." The second group of defendants was described as " members of a voluntary labor organization known as Boot & Shoe Workers' Union, hereinbefore mentioned," the plaintiff alleging on information and belief " that they are also members of the Shoe Workers' Protective Union, hereinbefore mentioned." Material allegations of the bill are described in the opinion. The first prayer of the bill was as follows: " That by final decree the defendants, both known and unknown, be permanently restrained and enjoined, both individually and collectively, from interfering with the plaintiff's business by threats, parade, picketing or other acts of intimidation; from interfering with any person or persons who now are or may hereafter be in the employ of the plaintiff or who may be desirous of entering the same; from obstructing, threatening, intimidating or in any way interfering with any such person or persons while entering or leaving the plaintiff's premises; from preventing any such person or persons from entering or continuing in the plaintiff's employment by threats, abusive languages, outcrys, following or any other acts of intimidation or by any scheme or conspiracy among these or with others adopted for the purpose of annoying, hindering, interfering with or preventing any such person or persons from entering or continuing in the plaintiff's employment."

The first suit was referred to a master. His report did not contain a report of evidence.

It appeared that the contract referred to in the opinion as " Exhibit A " was a so called " closed shop agreement."

" Exhibit B " had a title, " Stitching Room," and, under a series of headings, such as " Skiving," " Closing," " Staying," " Painting," " Marking," " Bench Work," etc., appeared in columns items of work with a price opposite each item.  Next, under the heading of " Remarks" and preceding the signatures of the parties, were the following provisions:

" Union to have shop committee.

" Agent to be allowed to visit factory during working hours.

" All work not on this list to be considered as new work.

" Prices for new work to be decided upon when new work is introduced.

" Work not to be done in the home except by a permit from the Union.

" No extra help to be hired on any operation while help already on that job are able to get the work out.

" No damaged shoes to be paid for.

" Help not to work before 7 A.M. or between the hours of 12 and 1 noon or after 5 P.M.

" Week to consist of five nine-hour days.

" Work having no piece price to be paid for by the hour at the rate of the last three full weeks; price not to be less than the list price.

" No help to be put to work without a permit from the Union.

" No one to be taught any skilled operation without a permit from the Ex. Board."

The agreement, " Exhibit C," which was made on August 5, 1921, referred only to the continuation in effect of certain prices " until the signing of a new list, which new list shall be prepared and presented to the Company by the Union immediately following ratification by the Union of stitching room prices now under discussion between the Union and the Haverhill Shoe Manufacturers Association."  There was therein no reference to the stipulations under the heading " Remarks " in " Exhibit B."  On this subject, the master found: " Apart from whatever meaning and effect may be given to Exhibit C by the court as a matter of construction, there was no written agreement of any sort at any time entered into undertaking to continue the operation

of the provisions contained in Exhibit B under the head of
' Remarks.' "

Other material findings by the master are described in
the opinion.  There were no exceptions to the report.  The
suit was heard on the pleadings and the master's report by
*DeCourcy*, J., by whose order there were entered an inter-
locutory decree confirming the report and a final decree
dismissing the bill.  The plaintiff appealed.

The contract which formed the basis of the second suit
was as follows:

" Boot and Shoe Workers' Union
" Headquarters, 246 Summer Street, Boston, Mass.
" Union Stamp Contract.

" Agreement entered into this Seventh day of April 1921
by and between Triangle Shoe Company shoe manufacturer
of Haverhill, Mass., hereinafter known as the Employer,
and the Boot and Shoe Workers' Union, with headquarters
at 246 Summer St., Boston, Mass., hereinafter known as
the Union, witnesseth:

" First.   The Union agrees to furnish its Union Stamp to
the Employer free of charge, to make no additional price
for the use of the Stamp, to make no discrimination between
the Employer and other firms, persons or corporations who
may enter into an agreement with the Union for the use of
the Union Stamp, and to make all reasonable effort to ad-
vertise the Union Stamp, and to create a demand for the
Union Stamped products of the Employer, in common with
other employers using the Union Stamp.

" Second.   In consideration of the foregoing valuable
privileges, the Employer agrees to hire as shoe workers,
only members of the Boot and Shoe Workers' Union, in good
standing, and further agrees not to retain any shoe worker
in his employment after receiving notice from the Union
that such shoe worker is objectionable to the Union, either
on account of being in arrears for dues, or disobedience of
Union Rules or Laws, or from any other cause.

" The Employer agrees that there shall be no discrimina-
tion against any member of the Union because of his or her
activity in the Union affairs.

" Third. The Employer agrees that he will not cause or allow the Union Stamp to be placed on any goods not made in the factory for which the use of the Union Stamp is granted, and the Employer agrees that it will be a violation of this contract to use the Union Stamp or Stamps in any other place than the particular factory for which the use of the Stamp is granted.

" Fourth. It is mutually agreed that the Union will not cause or sanction any strike, and that the Employer will not lock out his employes while this agreement is in force.

" All questions of wages or conditions of labor, which cannot be mutually agreed upon, shall be submitted to the Massachusetts State Board of Conciliation and Arbitration.

" The decision of this Board of Arbitration shall be final and binding upon the Employer, the Union, and the employes.

" The Employer agrees that where a change of system or method is made, he will notify the Local Union affected and endeavor to mutually agree upon a price to be paid. Failing to agree the matter shall be arbitrated and the decision rendered shall date from the time of change in system or method.

" In the event of the Employer or Local Union, or a duly authorized agent, giving written notice to the General President of their desire to refer to arbitration any matter in dispute, relative to wages, conditions of employment, interpretation of contract, or any other difference of opinion, he shall insist that the application for same shall be signed within seven days from his receipt of said notice. Failure of either party to comply with this clause shall constitute a direct violation of this contract.

" Fifth. The Union agrees to assist the Employer in procuring competent shoe workers to fill the places of any employes who refuse to abide by Section Four of this agreement, or who may withdraw or be expelled from the Boot and Shoe Workers' Union.

" Sixth. The Employer agrees that the regularly appointed collectors, or business agents acting in the capacity of collectors, shall not be hindered or obstructed in collecting dues from members working in the factory.

" Seventh.   The Employer agrees that the General President of the Union, or his deputy upon his written order, may visit the employes in the factory at any time.

" Eighth.   The Employer agrees that the Union is the lawful owner of the Union Stamp, and the Employer agrees not to make or cause to be made any Union Stamp or Stamps, and it is further agreed that the Union will furnish free of cost, all Stamps necessary to be used under this agreement.

" Ninth.   The Union agrees that no person except the General President, or his deputy upon his written order, shall have the right to demand or receive the Union Stamp from the Employer.

" Tenth.   Should the Employer violate this agreement, he agrees to surrender the Union Stamp or Stamps in his possession to the General President or his deputy, upon his written order, and that the said General President, or his deputy, may take said Stamp or Stamps, wherever they may be, without being liable for damages, or otherwise.

" Eleventh.   In case the said Employer shall for any cause fail to deliver the said Stamp or Stamps to the General President, or his deputy, as provided in this agreement, the Employer shall be liable to the General President in the sum of two hundred ($200) dollars, as liquidated damages, to be recovered by the General President in an action of contract, brought in the names of the General President for the benefit of the Union, against the Employer.

" Twelfth.   This agreement shall remain in force until May 1, 1922.   Should either party desire to alter, amend or annul this agreement, it shall give a written notice thereof to the other party three months before expiration of the agreement; and if the parties fail to give such notice, the agreement shall continue in force for another year, and so on from year to year until such notice is given.

" Thirteenth.   In case the Employer shall cease to do business, or shall transfer its business, or any part thereof, to any person or persons, or corporation, this agreement shall be ended, and the Stamp or Stamps shall be returned to the General President forthwith, without demand from the Union, when a new agreement, of similar tenor to this, may

be entered into between the Employer and the General Executive Board of the Boot and Shoe Workers' Union."

Those who formed the first group of defendants in the second suit, above described, demurred to the bill on the following grounds:

" 1. That the plaintiffs have not stated in their bill a case entitling them to any relief in equity.

" 2. That they have a plain, adequate and complete remedy at law.

" 3. The bill discloses that the plaintiffs themselves, or certain of their members, did the acts alleged to have been a breach of the contract attached to the plaintiffs' bill.

" 4. The bill is multifarious.

" 5. The allegations contained in the bill are so vague, indefinite, unspecific and uncertain that these defendants are not sufficiently appraised thereby of the nature of the case against them.

" 6. The contract attached to the plaintiffs' bill of complaint and alleged by the plaintiffs to have been unlawfully violated is void and illegal because: (a) it is against public policy; (b) it is in restraint of trade; (c) it lacks mutuality; (d) it is unconscionable; (e) because it is in contravention of 26 U. S. Stat. 209, c. 647, familiarly known as the Sherman Anti Trust Law; (f) because it is in contravention of G. L. c. 93.

" 7. Because it does not appear by the plaintiffs' bill of complaint what if any authority the parties signatory to the contract, attached thereto, had to execute the same.

" 8. Because it does not appear that the plaintiffs had any authority to bring this bill of complaint."

The Triangle Shoe Company demurred to the bill on the first and fifth grounds stated above.

The demurrers were heard by *Wait*, J., who ordered them overruled; and, being of opinion that the questions raised by the demurrers so affected the merits of the suit that they ought, before further proceedings, to be determined by this court, he reported the suit for that purpose.

The contract which was the basis of the third suit was of the same tenor as that which formed the basis of the second

suit, the date of its making being June 2, 1917, and its expiration date being June 1, 1918. The suit was heard by *Keating*, J. Material facts found by him are described in the opinion. By order of the judge, a final decree was entered " that the strike instituted and maintained by the defendants, officers and members of the Shoe Workers' Protective Union, is illegal, and said defendants, officers and members of the Shoe Workers' Protective Union, both known and unknown, individually and collectively, be and they hereby are permanently enjoined from interfering with the plaintiff's business by threats, patrols, picketing or acts of intimidation; from interfering with any person or persons who are now or may hereafter be in the employ of the plaintiff; from threatening or in any way interfering with any such person or persons while entering or leaving plaintiff's premises; from preventing any such person or persons from entering or continuing in the plaintiff's employment by threats, acts or intimidation, or by any scheme or conspiracy for the purpose of annoying, hindering, interfering with or preventing any such person or persons from entering or continuing in the plaintiff's employment; " and " the defendants " were ordered to pay costs to the plaintiff in the sum of $427.63. The defendants appealed.

*F. W. Mansfield,* for the plaintiff in the first case and for the defendants in the second and third cases.

*E. S. Abbott,* for the defendant in the first case.

*H. B. Ehrmann,* for the plaintiffs in the second case.

*F. P. Garland,* (*A. B. Tyler & F. H. Tilton* with him,) for the plaintiff in the third case.

BRALEY, J. These cases relate to controversies arising out of alleged contracts of employment largely of the same general tenor between voluntary organizations which are described as labor unions and their employers, or between rival unions where one union seeks supremacy in the employment of labor in their particular field of work in the city of Haverhill.

The bill in the first case was filed on May 5, 1922. The material allegations are that on April 16, 1919, the Shoe Workers' Protective Union entered into a written agreement,

wherein the defendant agreed to hire only members of the union, and if such members were not available it could employ other persons until such time as union men were available, if notice was given to non-union employees that they were hired subject to such conditions. The parties in addition to this agreement entered into subsidiary agreements regulating prices and conditions of employment in certain departments of the defendant's factory one of which dated July 19, 1920, applied to the stitching department, and is referred to as exhibit B. But as this agreement was limited in time, the parties verbally and by exhibit C agreed, that the conditions named in exhibit B should be continued in full force until a new agreement was consummated. The defendant is charged with having refused " to carry out the terms and conditions of the old agreement " and with having " violated the terms of the verbal and written agreement," by refusing to pay the price named in exhibit B for new work. It also is alleged that the employees are not permitted to have a shop committee; that the business agent is not allowed to visit the factory during working hours, while prices for defective new work have been fixed by the defendant without consultation with the Shoe Workers' Protective Union, or the Stitchers' Union whose members " are put to work without a permit from the Union and " work having no piece price is not paid for by the hour " at the rate stipulated under the head of " remarks " in exhibit B, but " the price paid is less than the piece price." The prayers for relief are that the defendant may be enjoined from violating the terms of the verbal and written agreements and for an accounting and the assessment of damages. It was agreed at the hearing before the master that exhibit A was terminated April 15, 1922, and the bill states that exhibit B " expired by its own limitation " July 18, 1921. But it is contended that the conditions of employment shown under the head of remarks in exhibit B were to continue in effect until " the signing of a new list " as provided in exhibit C. It is found however that no written agreement was ever entered into after the expiration of exhibit B. The plaintiff also claimed that an oral agreement

extending the conditions for a period identical with the period named in exhibit C was expressly made, or resulted by implication from the subsequent industrial relations of the union and the defendant, and that there was as matter of fact an observance of these conditions subsequent to July 18, 1921. But on unreported evidence the master finds that this was done as a matter of practice and not as matter of agreement, and no implied contract has been established. The parol evidence rule also applies, and exhibit C stood as explaining the working arrangements between the union and the defendant after exhibit B terminated. *DeFriest* v. *Bradley*, 192 Mass. 346. *Mears* v. *Smith*, 199 Mass. 319, 322. The defendant on January 7, 1922, closed its factory in Haverhill because of local labor difficulties, and moved to Lowell, where independently of the agreement shown by exhibits B and C read in combination, it employed non-union labor and conducted its factory as an " open shop." The plaintiff, whose membership and general agency terminated May 1, 1922, and who never was a stitcher or employed by the defendant, brought on January 27, 1922, a bill in equity in behalf of the union and its members, the allegations of which and the relief asked for are not in the record. By an interlocutory decree the defendant was enjoined " until and including April 15, 1922, from hiring or employing any shoe operatives . . . in Lowell who are not members of the . . . union where members of said union are available to work in said factory unless said union assents in writing to such hiring." The defendant in obedience to the injunction closed its factory, and requested the plaintiff to furnish at once sufficient members of the union to operate the stitching room. But a sufficient number were not provided, and the plaintiff, after admitting that stitchers could not be supplied, finally assented in writing to the employment of non-union members and agreed to issue irrevocable permits to those employed " where union members are not available." The defendant thereafter was compelled to employ stitchers who were not members of the union to operate its factory, and refused permission to the agent of the stitchers' local union to visit the stitching room, because,

as the master reports, the defendant took the position that the agent of the stitchers' union had no authority under the circumstances to make an inspection. The defendant on April 17, 1922, moved its " cutting room " to Haverhill where the operation of cutting has since been performed by its own operatives employed without recognition of the demands of the union. If exhibit C is held to have continued exhibit B in force, the employment of non-union stitchers, the refusal of inspection by the agent of the stitchers union, the denial of a shop committee, and the payment of lower wages to those stitchers than the wages specified in exhibit B are assigned as breaches of the agreement. But the claim for damages has been waived, and, quite aside from the position taken by the defendant, that the suit cannot be maintained by the plaintiff in his own name even if it was begun for " and on behalf of the Shoe Workers' Protective Union and its members " and by their authority, *Donovan* v. *Danielson*, 244 Mass. 432, it is plain on the foregoing review, that the remedy by injunctive relief would be the issuance of a mandatory injunction compelling the defendant to employ only stitchers of the union, which the master finds the union admitted could not be furnished. It should not be granted. *Hapgood* v. *Shaw*, 105 Mass. 276, 279. See *Rice* v. *D'Arville*, 162 Mass. 559; *Garcin* v. *Pennsylvania Furnace Co.* 186 Mass. 405, 411; *Butterick Publishing Co.* v. *Fisher*, 203 Mass. 122, 130. The question, whether in any event specific performance would be decreed of a contract solely for the performance of personal services of the nature and under the conditions of the contract in question, need not be decided.

The members of the Boot and Shoe Workers' Union bring suit in the second case against the Shoe Workers' Protective Union and a copartnership who are manufacturers of shoes, doing business under the firm name of Triangle Shoe Company, to which we shall refer as the company. The demurrants admit that the object and purpose of the defendants are to induce all shoe workers of Haverhill to join their association in preference to the union of the plaintiffs, and to induce all the shoe manufacturers, " and proprietors of

allied industries in . . . [the city], to agree upon the terms
of employment, compensation of employees, and working
hours " and other conditions, as established by their union.
In furtherance of this general policy the defendants " have
unlawfully conspired to drive the Boot and Shoe Workers'
Union out of the city of Haverhill, and by solicitation, in-
timidation, threats, violence and show of force, to cause
manufacturers under contract with the . . . Boot and Shoe
Workers' Union to repudiate such contracts," and to cause
members of the union of the plaintiff " to repudiate their
individual contracts of employment with such manufac-
turers." But the active efforts of the defendants are alleged
to have been more direct and specific. The plaintiffs and
the company on April 21, 1921, entered into a contract
whereby the defendants agreed to furnish to the company
its union stamp free of charge, and to make no additional
price for the use of the stamp, to make no discrimination
between the company and other firms, persons or corpora-
tions who may enter into an agreement with the union for
the use of the union stamp, and to make all reasonable
effort to advertise the union stamp, and to create a de-
mand for the union stamped products of the company,
in common with other employers using the union stamp.
The other material conditions of the contract relating to
terms of employment are substantially similar to the con-
tract referred to in the first case. The allegations of the
bill are explicit, and the defendants again admit that while
this contract was in force and with knowledge of it
and while members of the plaintiffs unior were working
for the company under it, they induced or coerced the com-
pany by threats and intimidation to join " the conspiracy "
to ruin the union of the plaintiffs, and that the company
acting in combination with the members of the defendants'
union have notified the plaintiffs, who are ready and willing
to perform, of their intention to repudiate the contract which
was in full force when the bill was filed. The case stated
ordinarily would be governed by *Walker* v. *Cronin,* 107
Mass. 555, and kindred decisions, and the bill could be main-
tained. But the defendants contend on various grounds

that the contract is illegal and they are immune from all liability. We are of opinion that none of the alleged causes of demurrer are well taken. The remedy at law is not plain and adequate, and the plaintiffs are not shown to have participated in the wrongful conduct of the defendants at any stage of the controversy. The bill is not multifarious, nor are the allegations so vague and indefinite that the defendants are not sufficiently informed of the nature of the complaint to enable them to make their defence, nor is there any question of mutuality of obligation, or remedy; for specific performance is not asked. The defendants in what they did were not acting under an alleged right to strike for the protection of their industrial or economic interests, but were endeavoring to destroy the individual rights of fellow workmen unless they submitted to their dictation and control. The story is directly and clearly told by the bill which as to parties is properly brought, and the defendants, being strangers to the contract and claiming no benefits under it, cannot attack its execution by the plaintiffs' general president, or its validity as between the parties. *Green* v. *Kemp*, 13 Mass. 515. *Borden* v. *Boardman*, 157 Mass. 410, and cases cited. *Shinsky* v. *Tracey*, 226 Mass. 21. *Tracey* v. *Osborne*, 226 Mass. 25, 29. *Raynes* v. *Sharp*, 238 Mass. 20. *Donovan* v. *Danielson*, 244 Mass. 432. *Rice* v. *Manley*, 66 N. Y. 82. *Ellsworth* v. *Mitchell*, 31 Maine, 247. It is further contended that the contract creates a monopoly, is against public policy, is in restraint of trade, is unconscionable, and is in contravention of G. L. c. 93, § 2, and the " Federal Anti-Trust Law," 26 U. S. Sts. at Large, 209, c. 647. The bill however asks to have the defendants enjoined " from intentionally doing anything, without legal justification, to his injury." *Davis* v. *New England Railway Publishing Co.* 203 Mass. 470, 478. Whatever may be shown at a trial on the merits, it cannot be said on the present record as matter of law that a federal question is involved or the contract is in restraint of trade, either at common law or under the statute. See *Hopkins* v. *United States*, 171 U. S. 578, 592. G. L. c. 93, § 2. The union stamp is not a trading stamp, the control of which under certain conditions may result in a monopoly, as pointed

out in *Merchants Legal Stamp Co.* v. *Murphy*, 220 Mass. 281.
It is a label or trademark showing that products bearing
the stamp are made by the manual labor of members of the
plaintiffs' union. Its use cannot be said on the averments
of the bill to be designed to suppress competition or generally
to control the manufacture of shoes put upon the market, or
to prejudice the public by restriction of production, or by
enhancement of prices. *Quincy Oil Co.* v. *Sylvester*, 238
Mass. 95. *Taylor* v. *Blanchard*, 13 Allen, 370. *Common-
wealth* v. *Strauss*, 191 Mass. 545, and similar cases are not in
conflict. It may be that there are provisions which a court
of equity in its discretion would not enforce by specific per-
formance. But the denial of such relief would not render
the entire contract illegal or voidable. *Hoban* v. *Dempsey*,
217 Mass. 166. The contract, in so far as it related to the
exclusive employment of union labor, cannot, in the absence
of further allegations or of evidence, be condemned as
illegal because tending to foster a monopoly, or to violate
the anti-trust law. *Smith* v. *Bowen*, 232 Mass. 106, 110.
*Shinsky* v. *O'Neil*, 232 Mass. 99, 102. *Ryan* v. *Hayes*, 243
Mass. 168. *Berry* v. *Donovan*, 188 Mass. 353, is distinguish-
able for reasons stated in *Hoban* v. *Dempsey*, *supra*. See
also *Minasian* v. *Osborne*, 210 Mass. 250, 255; *Shinsky* v.
*O'Neil*, *supra*; *Folsom Engraving Co.* v. *McNeil*, 235 Mass.
269, 278. It is not rendered invalid because of the clause
relating to the arbitration of differences which may arise
between the employer and employee, for reasons stated in
*Marsch* v. *Southern New England Railroad*, 230 Mass. 483,
493, 494. Nor is the contract itself as matter of law done
away with by these attacks, although at a trial on the merits
the evidence may show that under all the circumstances it
was entered into for the sole purpose of unjustifiably stifling
competition and preventing the free flow of labor, *Haverhill
Strand Theatre, Inc.* v. *Gillen*, 229 Mass. 413, 418, and that
the members of the union who left the employment of the
company are included among the parties plaintiff. The
contract however was for the benefit of all the members,
and if they are not included, or if as to them the suit is dis-
continued, the other members should not be deprived of

their individual rights against the defendants who will not be permitted to take advantage of their own wrongdoing in procuring the abandonment of their work by the company's employees for the purpose of accomplishing an abrogation of the contract, as stated in the bill.

The plaintiff corporation in the third case is a manufacturer of shoes at its factory in Haverhill where for some years prior to filing the bill it had carried on business, and the labor unions previously named were located. The presiding judge has found, that, although defectively executed by the Boot and Shoe Workers' Union, yet by ratification of the parties the plaintiff and the union on June 2, 1917, entered into a contract, permitting the plaintiff to use the union stamp on condition that the corporation should employ only members of the union in good standing. The defendants earnestly contend that this finding is erroneous. But the evidence is not reported. It must be presumed that all the elements required to show ratification were sufficiently proved, and the general finding accordingly must stand. *Remick* v. *Sandford,* 118 Mass. 102. *New England Dredging Co.* v. *Rockport Granite Co.* 149 Mass. 381. *W. A. Snow Iron Works, Inc.* v. *Chadwick,* 227 Mass. 382, 390, 391. The terms of the contract, which do not materially differ as to conditions of employment from those already discussed, were observed by the parties for more than five years, and on October 4, 1922, as the judge states, the plaintiff had in its employment one hundred and eighty members of the Boot and Shoe Workers' Union and about thirty members of the Shoe Workers' Protective Union. It appears that these unions were rival organizations each striving to increase its membership at the expense of the other, and at a meeting of the Shoe Workers' Protective Union it was voted, "that those who wished to belong to the Shoe Workers' Protective Union only should finish the work they had on hand in the factories in which they were employed . . . quit work and report at the . . . headquarters" of the union. The reason for this action is stated to have been, that the Boot and Shoe Workers' Union not being able to supply sufficient members under their contracts, resorted to the

membership of the Shoe Workers' Protective Union for reinforcements. But members so obtained were employed merely to enable the Boot and Shoe Workers' Union to perform its contracts and they were not allowed to hold office or to be delegates under the constitution of the employing union. The defendants pursuant to the vote sent on October 4, 1922, fifteen members who were not employees of the plaintiff to picket its factory where there was no strike, nor any dispute between the plaintiff and its employees " unless the desire of the Shoe Workers' Protective Union to get all the work in the plaintiff's factory for themselves may be called a trade dispute." The blow fell without warning for " they had not complained to the plaintiff in reference to labor conditions in the factory." It was undisputed that the defendants authorized and made arrangements for continued picketing and paid the picketers. While this movement was under way thirty of the defendants, members of the Shoe Workers' Protective Union who were employed by the plaintiff, without giving any notice abandoned their work and some of them joined the picketers. The judge states that the picketers and the participating employees " acted in pursuance of a conspiracy to induce by picketing those who were about to enter the plaintiff's employ to refrain from doing so, and to compel or induce those remaining in the plaintiff's employ to quit the Shoe Workers' Protective Union." The picketing then inaugurated was continued every working day until the case was tried in January, 1923. It is found " that the picketing annoyed the plaintiff's employees and made them apprehensive lest they might not be able to continue at work in the plaintiff's factory unmolested." During the progress of the strike thirty-five of the plaintiff's employees joined the union of the defendants and assisted in maintaining the picketing. " It is reasonable," says the trial court, " to infer that these thirty-five persons quit the plaintiff's employ and joined the Shoe Workers' Protective Union as a result of the strike and the picketing, and I so find. . . . I find that the defendants conspired to interfere with the plaintiff's business, and injure it, and that they did interfere with and

injure it.   I find that the defendants conspired to interfere with the employment of those continuing in the plaintiff's employ after October 4, and that they did interfere with it. It was the contention of the defendants . . . that their purpose in instituting and maintaining the strike was to get all of the plaintiff's work or none of it.   I do not find that such was their purpose.   I find that their purpose was to compel the plaintiff to give all its work to the members of the Shoe Workers' Protective Union."·   While the defendants did not solicit the plaintiff to break its contract with the Boot and Shoe Workers' Union, they are found to have known that a contract existed and that if the strike was successful and they received all of the plaintiff's work the contract would be broken.   It is argued that the strike was lawful and the contract was void under G. L. c. 93, § 2, and the defences considered in Lovely v. Gill, are again urged.   But it was a concerted effort to force the plaintiff's employees to leave their employment.   It was successful because of picketing and intimidation.   A further purpose was to compel the plaintiff to hire only members of the defendants' union to the exclusion of all other workmen whether they were members of a rival union or were not affiliated with any association of organized labor.   It has been repeatedly decided that the acts of the defendants were unjustifiable.   *New England Cement Gun Co.* v. *McGivern,* 218 Mass. 198, 203.   *Tracey* v. *Osborne,* 226 Mass. 25, 29. *Folsom Engraving Co.* v. *McNeil,* 235 Mass. 269, 277.   *United Shoe Machinery Corp.* v. *Fitzgerald,* 237 Mass. 537, 544.   It is found that when the attack began sixty-five of the defendants were members of the Boot and Shoe Workers' Union, and the judge ruled that as to them, " the strike was also illegal because of their violation of that contract." But no question of specific performance is presented, and the claim for damages was not pressed at the trial.   It is apparent however on the record that they left work and acted with the other defendants in their unlawful efforts to force the plaintiff to close its factory, or yield to unjustifiable demands.   *Folsom Engraving Co.* v. *McNeil,* 235 Mass. 269, 276.   *Hotel & Railroad News Co.* v. *Clark,* 243 Mass.

317.   The decree although properly entered on the facts found, and the issues presented by the bill, is too broad in scope.    While it should be modified by inserting in the sixth line after the word " intimidation," the words " as alleged in the bill and," no further changes are necessary.    *Vegelahn v. Guntner,* 167 Mass. 92, 99.   *Aberthaw Construction Co. v. Cameron,* 194 Mass. 208, 215.   *Hotel & Railroad News Co.* v. *Clark,* 243 Mass. 317.   It follows, that in the first case the decree is affirmed with costs, and in the second case an interlocutory decree overruling the demurrer is to be entered; while in the third case the decree is to be modified in accordance with this opinion, and as thus modified it is affirmed with costs.

*Ordered accordingly.*