## MARTIN et al. v. LUSTER.

### No. 5584.

Circuit Court of Appeals, Seventh Circuit.

July 17, 1936.

As Amended on Rehearing Nov. 4, 1936.

Charles S. Babcock, of Chicago, Ill., Roy P. Wilcox, of Eau Claire, Wis., and Alfred Beck, of Chicago, Ill., for appellants.

John C. Slade and Charles J. Calderini, both of Chicago, Ill., A. W. MacLeod, of Eau Claire, Wis., and Wm. D. Tatlow, of Springfield, Mo., for appellees.

Before EVANS, SPARKS, and ALSCHULER, Circuit Judges.

EVANS, Circuit Judge.

This appeal is from an order terminating a receivership of a $266,345 fund which it is alleged appellees' decedent (Frank Hermann) held in trust for appellants. Heretofore appellees, as Hermann's executors, were ordered to pay this sum to the receiver. The District Court, in the decree appealed from, ordered the return of the money, less expenses, to appellees.

The determinative issue turns upon the nature of the relationship of Hermann, the underwriter of the reorganization, to the new corporation and to the stockholders of the old corporation. The plan of reorganization approved by the court and an underwriting agreement, which was indispensable to the plan, to a large degree establish Hermann's status which in turn determines his liability and that of the executors of his will.

Hermann undertook to deposit $315,000, which was the sum which it was estimated would be necessary to effectuate the plan. Either as consideration for this sum or as a means to procure it, he was issued 100,000 shares (all) of the common stock and preferred stock of the par value of $50,000 of the new company. The plan and the underwriting agreement were both consummated and the deposit made. Creditors of the old company were given preferred stock in payment of their claims. They also had the right to sell such stock to Hermann for a certain percentage of cash, which cash came from the above-described fund. Nearly one hundred thousand dollars of this deposit was unused and returned to Hermann after the reorganization. He purchased a great many shares of preferred stock from creditors, as the agreement provided, and *sold* the preferred stock to the company at the same price at which he purchased it. The company later called in all the preferred stock.

During the course of this litigation it has been the contention of appellants that Hermann occupied a trust relation to the old stockholders and to the corporation. As a necessary corollary it is argued (a) that he wrongfully *resold* the preferred stock to the company whereas he should have *retired it gratis,* or (b) that he was given the 100,000 shares of common stock, not outright, but as a means to raise the necessary money for reorganization, and the balance of the stock not sold belonged to the company.

The District Court made findings and conclusions, and also filed a carefully considered memorandum opinion holding no trust relation whatsoever existed. He reviewed the conflicting oral testimony and depositions and the varying pleadings and amendments, and concluded in favor of Hermann's executors for the following reasons: (1) The amended complaint [which differs from the one on which the former appeal (C.C.A.) 58 F.(2d) 537, arose] makes the alleged trust agreement an incident of the *plan of reorganization* (a former complaint made it incident to the underwriting agreement) from which it follows: (a) that such an important item would have been disclosed to the court, in the course of effecting the reorganization and certainly should have been so disclosed; (b) such an agreement would have been a material modification of the plan and if undisclosed to it would be in defiance of it; (c) it was four years before any stockholder suggested that such an agreement existed. (2) Evidence of conversations necessary to establish an agreement with the decedent was not admissible. (3) Since all other agreements were in writing, it is significant that the alleged agreement was not. (4) It was Hermann who deposited the money, and it was he who was issued the stock, just as the written plan provided. (5) Execution of the plan by a special master and a commissioner, under directions of the court, shows the plan was a complete one. (6) Oral testimony given many (eight or nine) years after the event is not reliable. (7) Variance in the material allegations in the original, first and second amended bills; also if the trust in conjunction with the plan existed, it would probably have been alleged in the original bill.

In more detail, the facts are as follows:

The Gillette Rubber Company was in receivership and Hermann appointed one of two receivers in April, 1922. He subsequently became sole receiver. He was a director of the old company and was president (until September, 1929) of the new company, serving also as a director and manager. Mr. Kent, who was chairman of the reorganization committee, submitted an underwriting agreement to Hermann, April 20, 1924, which Hermann accepted the next day. Because of the importance of the terms of this agreement in determining the true facts, we set forth, in the margin, portions of the agreement verbatim.[1] Pursuant to the terms of this agreement Hermann was to deposit $315,000 to effectuate the plan of reorganization, and he was to be issued all (100,000) shares of common stock of the new company and preferred stock of the par value of $50,000 (to cover $35,000, of the $315,000, for reorganization expenses). The plan of reorganization was approved by the court, May 8, 1925.[2] The plan contained no pro-

---

[1] "Management Underwriting Plan Submitted to F. C. Hermann by H. R. Kent in Behalf of Creditors and Bondholders.

"3. Disposition of Common Stock: To be given to the management for its underwriting the cash requirements and its obligation to undertake the management and supply the new company with customers. * * *

"Out of the common stock, the management to make such arrangement as it wishes for the old stockholders to provide them with participation certificates to induce them to consent to the transfer of the property without foreclosure. (Foreclosure took place.) * * *

"6. Reorganization Expenses: The corporation shall issue $50,000.00 * * * Preferred Stock which shall be purchased by the management at 70, or * * * $35,000.00. * * *

"The other cash requirements of the plan, to-wit, the sum of $280,000, or such portion thereof as may be necessary to pay cash to those preferred creditors and general creditors who shall elect to take cash under the plan, shall likewise be payable on demand to the Reorganization Committee by the underwriter upon delivery of the proportionate amount of bonds and preferred stock provided for preferred and general creditors and released by such preferred and general creditors as elect to take cash instead of the securities offered.

"7. Management of New Corporation: The new corporation shall be under the management of F. C. Hermann who agrees to secure satisfactory personnel and who will receive all the shares of the common stock of the new corporation without par value, a part of which common stock shall be used to provide participation certificates for such stockholders of the present corporation as give their consent to the plan of reorganization; and for the further purpose of securing to the new corporation satisfactory department heads and other managerial personnel in whatever manner the said F. C. Hermann may decide, and for his own interest in the new corporation. * * *

"8. Underwriting: F. C. Hermann agrees to purchase all preferred stock offered to general creditors at the proportionate price indicated, viz., for each $30.00 par value of preferred stock, the sum of $15.00, and for the total of $50,000.00 par value of Preferred Stock, the sum of $35,000.00 to be used for reorganization expenses * * *—all such sums to be paid by the underwriters for preferred stock offered to creditors and released by them on their acceptance of cash instead, and the sum of $35,000.00 upon demand by H. R. Kent as aforesaid, and the cash to be paid to said H. R. Kent for creditors who exercise their option to take cash, promptly upon the delivery to the underwriter of the certificates for stock released by creditors taking cash in lieu thereof."

[2] "Plan of Reorganization.

"* * * Article III. Offer to Creditors of the Old Company.

"1. To the holders of bonds of the Old Company, * * * 60% of the par value * * * in bonds * * * and * * * 15% * * * in cumulative 7 percent preferred stock * * * of the new Company. * * *

"2. The new Company offers to holders of preferred claims * * * 60% of such claims in bonds of the New Company and * * * 40% in cash.

"3. To unsecured creditors * * * 30% * * * of their claims * * * in said first preferred cumulative stock (See Article V. for cash option).

"Article IV. New Company to Retain Hermann Management. Management of the New Company.

"The success of this Plan is predicated upon the ability and showing made by F. C. Hermann, who has acted as Receiver of the Old Company, * * * that he, personally, as the result of such organization, (which he has built up) can secure to the new enterprise. Mr. Hermann has executed an agreement to underwrite the cash requirements of the

vision as to stockholders in the old company, but the underwriting agreement did. The plan provided that creditors holding preferred claims in the old company be paid 40% in cash and that general creditors be paid in preferred stock of the new company at the ratio of 30¢ par value to dollar of claim, and the preferred stock so received could be sold to Hermann at 50¢ on the dollar of par value (giving them in actuality 15¢ on the dollar for their claims).

The new company issued a certificate for 100,000 shares of common stock to Hermann. He immediately broke this lump holding into 49,000 shares to be sold to raise the sum underwritten and 51,000 shares to be placed in a voting trust (of which he evidently held 26,000 shares). Of the 49,000 shares he sold 34,775 shares to old stockholders for $178,927.80; 2,568 shares to others for $12,840, or a total of $191,767.80. The remaining 11,657 shares of the 49,000 block, he held himself and in February, 1929, sold, along with the shares he held in the voting trust block, to Gillette and Hutchens for $21 a share. The common stock (originally planned without par value) was of the par value of $5.40.

Hermann made the deposit of $315,000, and this fund was used as follows: $71,500.58 was used to pay preferred creditors 40% of their claims against the old corporation; $104,207.60 was paid to general creditors who turned in their preferred stock to Hermann; $35,000 went to the reorganization committee; $6,186.80 was given to non-depositing bondholders for preferred stock given them in payment of their claims. The total disbursements from the $315,000 fund were therefore $216,894.98, which left an unexpended balance of $98,105.02. This sum was returned to Hermann upon order of court entered upon petition of the reorganization committee and signed by counsel for appellants.

Hermann became very ill in 1929 and severed connections with the company. He disposed of his stock holdings, both common and preferred. The 26,459 shares of common stock (the 11,657 of the 49,000 block and 14,500 of the voting trust, and 302 shares from some other source) he sold to Gillette and Hutchens for $21 per share, a total of $555,639. The preferred stock he sold to the company at half of the $15 par value, or $7.50. Of the preferred stock, he held 17,377½ shares, which at $7.50 (50% of par value) amounted to $130,331.25. The total sales price of all stock interest was $685,970.25. If the transaction of Hermann be viewed as an entirety and the above figures be used in the calculation, it will be found that Hermann profited by approximately $660,843.07 out of the reorganization of the company for which he was the receiver. In addition he received a salary of $25,000 per year and dividends were paid regularly (5 to 10%) on the common stock.

In order to get a true picture of circumstances of this reorganization, we quote in the margin excerpts from various documents presented in evidence, including the

---

New Plan and to devote himself to the management of the new Corporation.

"Article V. New Money Furnished by F. C. Hermann. Underwriting.

"F. C. Hermann has agreed to advance cash and underwrite the financing of this Plan to the extent of $315,000. In return for said advances he is to receive all of the common stock, $50,000 par value preferred stock at * * * 70% face value. * * *

"He also agrees to purchase any of the preferred stock taken by unsecured creditors at fifty per centum of the face value thereof, in case any unsecured creditors shall so elect and shall make his election known within ten * * * days after the distribution of such preferred stock. * * * *"

Unsigned Addenda to plan as submitted to court:

"Stockholders.

"The stockholders under the above plan deal directly with Mr. F. C. Hermann under Article IV of the plan. 100,000 shares of non par stock are to be issued to Mr. F. C. Hermann. The stockholders may acquire up to 50,000 shares at a price of $5.40 per share. The money derived from stockholders less a reasonable expense is to be used in retiring creditors claims at $.15 on the $1.00 and cancelling the preferred stock that is to be issued for the same account.

"$100,000 is to be paid to stockholders who have deposited their stock, said payment to be made out of earnings of the new company and evidenced by participating certificates.

"The above plan is the offer of Mr. F. C. Hermann to the stockholders."

circular letter of July 5, 1924, to stockholders [3] and Hermann's letter of April 28th.

A case growing out of the same transaction which is illuminating arose in the eighth circuit wherein Gillette, Hutchens,

[3] Letter Mailed to Stockholders with Plan.

"* * * July 5th, 1924.

"To the Stockholders of the Gillette Rubber Company:—

"We are glad to report to the stockholders of The Gillette Rubber Company that a plan agreeable to practically all the diversified interests has been agreed upon * * * (It) was a huge task. We have worked unceasingly for * * * two years to accomplish something for the stockholders and have always had their best interest in mind. * *

"We early recognized that Mr. F. C. Herman was necessary to any plan which we could honestly recommend to the stockholders, and we have at all times understood Mr. Herman's feelings with respect to such stockholders as were willing to help themselves and the stockholders today are offered an equal opportunity with Mr. Herman in the ownership of this business.

"We also recognized that the bondholders had the first claim * * * that the unsecured creditors came next and in the payment of these two classes of debtors (creditors) there would be nothing left for the stockholders.

"On April 21st, 1924, the * * * committees submitted a plan * * * to Mr. Herman which was accepted by him. Under that plan Mr. F. C. Herman agreed to furnish all the cash requirements and in return was to be given all of the 100,000 shares of non-par common stock in the new company, and he has very generously offered to sell to the stockholders one-half or 50,000 shares at the agreed price of $5.40 per share. The money derived from this does not go to Mr. Herman personally but is to be used in retiring as many of the unsecured debts as possible at fifteen cents on the dollar, and thus permitting the stockholders to become part owners with him.

"In addition to this the stockholders will get something for their old stock. Mr. Herman has agreed that the new company shall pay to the stockholders who deposit their stock in the old company, $100,000 out of the earnings of the new company, to be evidenced by participating certificates. (This provision became inoperative) * * * The preferred stock in the new company will be materially reduced by payment of unsecured debts at fifteen cents on the dollar. * * *

"Yours very truly,
"D. S. Runnels."

"April 28th, 1924.

"Mr. I. T. Gilruth, (sometimes counsel for receiver)

"c/o Henry J. & Chas. Aaron, (counsel for creditors' committee)

* * * * *

"Dear Mr. Gilruth:—

"I received the copy of the agreement and noted, and I guess we understand each other thoroughly.

"In regard to the underwriting will say my idea is about as follows: Take 50% of the 100,000 shares, which would be 50,000, sell that amount to the old stockholders, if they want it, at $5.00 per share,—and use the proceeds from the sale of this stock towards retiring the Preferred Stock given to creditors. * * * This would give the old stockholders the proposition they have wanted all the time, to get some Common Stock that is a permanent investment. * * * this plan is open for discussion, and if you think of something better, let's have it.

"Very respectfully,
"Frank C. Hermann (Signed)"

"April 24, 1924

"Mr. H. R. Kent

* * * * * *

"Dear Mr. Kent:

"Received yours of the 23rd and noted. We will have no trouble at all in financing the proposition. I think I have my plans so arranged that I can furnish the money promptly as needed. I am making a proposition to the old stockholders to give them a chance to come in on the new deal, and I feel sure it will go through.

"Very respectfully,
"Frank C. Hermann."

"January 23, 1925.

"Mr. Frank C. Hermann,

* * * * * *

"Dear Mr. Hermann:

"* * * Under the plan all of the common stock was given to you. Under our law, we do not have to * * * secure a permit where the stock is to be subscribed for by twenty-five people or less. In our case, which is the common stockholder's case, there was nothing for them except such stock as you, individually, cared to let them in on. You personally agreed, as I understand it, with the reorganization committee to finance the deal and in consideration for that you were given all of the common stock. Now, it was optional with you as to whether or not any stockholder should get a penny or even an opportunity to purchase the common stock, and under

and Gilruth sued Hermann and alleged that he agreed each should have one-fourth of the 51,000 shares in the voting trust and that he had given them only a total of 25,000 (leaving him in control). They, however, purchased the stock from him later, and the Court of Appeals held [Luster v. Gilruth, 60 F.(2d) 751] that the subsequent purchase negatived the charge that they were to share in all the stock he acquired.

A previous appeal was taken to this court [58 F.(2d) 537] from the order appointing the receiver of the trust fund. On that appeal this court held the cause of action against Hermann survived his death and that the District Court in Wisconsin had jurisdiction of the alleged trust; that the stockholders' cause of action was a class action; and that the allegations of the bill supported the appointment of a receiver. Pertinent portions of that opinion are set forth in the margin.[4]

Chronologically, the facts are:

| Date | Event |
| --- | --- |
| April, 1922 | Hermann appointed one of two receivers for old company. |
| Jan., 1924 | Kent selected as chairman of committee on reorganization. |
| April 20, 1924 | Underwriting agreement submitted by Kent to Hermann and accepted by him, April 21. |
| June 19, 1924 | New company organized. |
| June 20, 1924 | Plan signed by new company. |
| July 5, 1924 | Circular letter to stockholders. |
| March 25, 1925 | Kent and committee petitioned court to approve plan. |
| May 8, 1925 | Plan of reorganization approved by court. |
| August 13, 1925 | Certificate of 100,000 shares of common stock issued to Hermann. |
| August, 1925 | Voting trust of 51,000 shares created, Hermann having 26,000. |
| Dec. 24, 1925 | Before this time Hermann sold 14,718 shares of preferred stock to company (findings say 15,778 in December and 1,599½ afterwards). |
| Dec. 29, 1925 | Resolution of directorate of new company to purchase outstanding preferred stock as it was able. |
| Dec. 30, 1925 | Hermann discharged as receiver. |
| Feb., 1929 | New company had purchased 26,836 preferred stock, leaving 19,241¾ outstanding. All shares of preferred stock called for redemption. |
| Feb. 24, 1929 | Hermann sold all common stock (26,459 shares—14,500 from voting trust) to Gillette and Hutchens at $21. |
| March 18, 1929 | Charter changed so only 200,000 shares of common stock. |
| Sept., 1929 | Hermann ceased being president of new corporation. |
| Dec. 2, 1929 | First complaint in equity filed on removal to District Court (Started in State court, Nov. 22, 1929). |
| Jan. 14, 1930 | Hermann died. |
| July 17, 1931 | Trust fund receivership set up. |
| April 7, 1932 | Opinion of this court on previous appeal, 58 F.(2d) 537. |
| Nov. 30, 1932 | Second amended bill filed. |
| March 16, 1935 | Order of District Court terminating receivership of trust fund. |

your agreement with us the amount of common stock which we subscribed, the money which was paid for the same was not taken by you but used in the retiring of obligations under the settlement with the creditors and others and the sale of the stock amounted to a re-sale only. * * *

"Yours very truly,

"M. Catlin."

4 "That the facts set forth in the complaint state a good cause of action against Hermann in favor of some one is too plain for argument. It is likewise apparent from the facts alleged that Hermann should be charged as a trustee of the funds by him received from the stockholders, if such funds can be traced, and the rights of third parties have not intervened.

"Equally clear is our conclusion that the cause of action for which relief is sought belonged to appellees as stockholders and not to the corporation, the Gillette Tire & Rubber Company.

"We do not mean to hold that the corporation, as a third party beneficiary to such an agreement as Hermann and the stockholders entered into, may not (at least in Wisconsin, Sedgwick v. Blanchard, 164 Wis. 421, 160 N.W. 267) enforce its rights in a direct suit brought by it on said agreement. But appellees' cause of action was not traceable to nor dependent upon the company's cause of action. It arose out of an agreement which was entered into before the company was created, and was likewise independent of the rights of the company, and, therefore, enforceable, regardless of the company's consent, opposition, or indifference.

"This disposition of the appeal, it is needless to add, is based upon the facts presented by the record before us. The appeal is from an interlocutory order made upon a showing by affidavits. The trial on the merits may change the fact situation so as to necessitate new and different findings respecting the agreement made by Hermann with the stockholders when they purchased the common stock. Nothing said in this opinion is intended to foreclose the full presentation and determination of that issue upon the trial."

Hermann's profits in the whole transaction from *hindsight* are:

| | | |
|---|---:|---:|
| He deposited pursuant to underwriting agreement | | $315,000. |
| for which he received the following items: | | |
| (a) 100,000 shares of common stock of par value $5.40 | | 280,000 |
| (b) Preferred stock of par value of $50,-000 | | 35,000 |
| Total | | $315,000 |
| He was returned between Aug. 29, 1925 and Jan. 9, 1926, from this deposit by order of court after reorganization | | 98,105.02 |
| | | $216,894.98 |
| He sold out of the 100,000 shares of common stock | | |
| 34,775 shares to old stockholders for | $178,927.80 | |
| 2,568 shares to others for | 12,840 | |
| | $191,767.80 | 191,767.80 |
| The remainder which he did not receive by sale of common stock | | $ 25,127.18 |
| * * * | | |
| He later sold to Gillette and Hutchens | | |
| 11,657 shares of common stock (of the 49,000 portion) | | 244,797 |
| 14,802 shares of common stock | | 310,842 |
| | | $555,639 |
| He also later sold 17,377½ shares preferred stock to company at $7.50 | | 130,331.25 |
| Total he received for stock held (not counting 400 shares turned in for son-in-law's note) | | $685,970.25 |
| | | 25,127.18 |
| Net profit, subtracting the balance above | | $660,843.07 |

These figures are approximately correct. There seems to be some slight conflict in the record of the various stock holdings, and therefore the approximation.

Much difficulty, as well as this prolonged litigation, might have been avoided had Hermann been denied the right to participate actively in the reorganization of the company for which he was acting as receiver. There may be instances when the condition of an embarrassed company and the unusual qualifications of the receiver justify an order by the court which permits the receiver to deal, as an adverse party, with the property for which he is a receiver. (See volume 23, Ruling Case Law, "Receivers," Secs. 83 and 84.) We doubt it. The dual position in which a receiver finds himself, under such conditions, is intolerable. His interests conflict. Jackson v. Smith, 254 U.S. 586, 41 S.Ct. 200, 65 L.Ed. 418. As receiver he is the arm of the court. (Bogert on Trusts, vol. 1, § 14.) He has obtained inside information concerning the future possibilities of the company. As a receiver he represents all the stockholders and all the creditors. The court is entitled to his advice and should be free to rely upon it.

Notwithstanding Hermann occupied such a position he was permitted to become a purchaser of the assets of the corporation and in no small way to direct the amount the creditors should be paid as well as the manner of payment. He held the fate of the stockholders in his hands. It was a case of Hermann, receiver, to protect stockholder, versus Hermann, who was making a purchase the profits from which depended upon the extent to which he could reduce the amount that he paid the stockholders.

The query naturally arises, In what capacity did Hermann act? Was he the receiver when he arranged to organize a new company and acquire the stock thereof? Was he in a position to advise the court as a receiver respecting the fairness of the plan of reorganization wherein he individually was purchaser? We think not.

It is true that an executor or a guardian or a trustee may at times further bids, if permitted to purchase a part or all of the estate for which he is a conservator. Unfortunately, however, there may be times when he will be the only bidder and at other times he may be interested in eliminating other bidders. Hence the rule which forbids such court official from purchasing at such sales. It is a wise and safe rule. Its wisdom has been demonstrated by experience. Bogert on Trusts, volume 3, § 484, p. 1514.

Undoubtedly much of the litigation which has vexed the courts for the last eight or ten years growing out of this reorganization would have been avoided had Judge Luse lived. He apparently had great confidence in Hermann's ability to conduct this rubber tire business. He, too, was anxious to avoid liquidation and equally desirous of continuing a business which was important to the people of Eau Claire.

In the conduct of a receivership, courts are required to make administrative orders and seldom do the court files completely record all of the understandings and fact representations which are known to the court only. It is for this reason that we observed that much of the trouble

would have been avoided had the presiding judge not been called by death.

We must, however, take the situation as we find it. No appeal was taken from the order which allowed Hermann to purchase the assets of the old company and organize a new company. In fact, the court was encouraged to so proceed by those who are now crying the loudest.

Out of this prolonged and bitter legal contest, the issue is over Hermann's liability as an alleged trustee. Two basic questions are presented. One is a question of fact and the other, one of law. In truth, the issue of fact is largely one of conclusion. (a) Did Hermann receive the common stock with the understanding that he was to sell 49,000 shares of it to old stockholders *and apply the proceeds thereof to the retirement of preferred stock which had been issued to creditors of the old company?* (b) Did the evidence of the agreement or understanding conflict with or violate the provisions of the underwriting agreement or plan of reorganization?

Obviously, if there were no such understanding or agreement, the second question becomes academic. However, in the consideration of the first question, it is perhaps a worthy argument to assert that parties interested in creating a trust fund would have done so in a manner which was valid and binding beyond dispute. Therefore, this second question somewhat affects the determination of the first question.

The District Court made a finding to the effect that no agreement creating a trust in 49,000 shares of stock of the new company existed.

■ If this finding depended solely upon the oral testimony of certain witnesses spoken in open court, we would find ourselves compelled to accept it. A careful statement of the reasons why the District Court rejected the oral testimony of numerous witnesses upon which appellants largely depend as unreliable and untrue, would necessitate our applying the well-known rule that appellate courts must accept the findings of the District Court where there is evidence and reason to support them. Uihlein v. General Electric Co. (C.C.A.) 47 F.(2d) 997.

We are, however, unable to explain or avoid the effect of certain documentary evidence. It seems to us that Hermann's letter of April 28th established a case from which he cannot escape.

■ We are satisfied that the plan of reorganization and the underwriting agreement should be construed together. Nor is there in either document anything which would preclude Hermann from accepting 49,000 shares of stock of the new company and validly binding himself to sell them to old stockholders at $5.40 per share and to devote the proceeds to the *retirement* of the preferred stock. Likewise, we are not much concerned about the form of the documents or the language used in creating this trust. (Bogert on Trusts, vol. 1, § 45, p. 197; In re Grigsby-Grunow (C. C.A.) 80 F.(2d) 478.) We are interested in the fact, not theories of counsel as set forth in different pleadings, briefs or letters.

The underwriting agreement contemplated a more elaborate and detailed plan later on. Both plans left disposition of stock of the new company held by Hermann open to future action by Hermann.

In his letter of April 28th, Hermann elaborated his understanding of the plan, particularly the disposition of the 100,000 shares of stock which were to be issued to him. He also explained his method of securing the cooperation of the old stockholders. He says he was "to use the proceeds from the sale of this stock toward *retiring* the preferred stock given to creditors."

When the plan was sent out for approval it was accompanied by a letter, the all-important paragraph of which reads as follows:

"On April 21st, 1924, the bondholders and creditors committees submitted a plan of reorganization to Mr. Hermann which was accepted by him. Under that plan Mr. F. C. Hermann agreed to furnish all the cash requirements and in return was to be given all of the 100,000 shares of non-par common stock in the new company, and he has very generously offered to sell to the stockholders one-half or 50,000 shares at the agreed price of $5.40 per share. The money derived from this does not go to Mr. Hermann personally but is to be used in retiring as many of the unsecured debts as possible at fifteen cents on the dollar, and thus permitting the stockholders to become part owners with him."

■ If we ignore for the moment the oral testimony of Catlin, Wilcox, Lange or Kootz and view their sworn statements as

entitled to no weight, as the District Judge did, it is still quite impossible, in view of these two letters, one from Hermann and one which the chairman of the stockholders' committee set out, to conclude other than that Hermann offered to sell 50,000 shares of the common stock at the agreed prices of $5.40 per share and the money derived from the sale of this stock should go, not to Mr. Hermann personally, but was to be used in retiring preferred stock. (Later, the 50,000 shares were reduced to 49,000 shares.)

As corroboration, it is worthy of note that the creditors were to take part cash and some preferred stock; that the preferred stock was to be retired. There is further corroboration to be found in the action of Hermann. He did set aside a certain amount of stock to be sold the stockholders of the old company. He did offer most of it for sale to said old stockholders. He did use the proceeds thereof to buy preferred stock. He did not, however, *retire* the preferred stock.

There is, moreover, the further corroboration which appears in the testimony of Mr. Kootz. Assuming that prejudices influence witnesses to the extent of coloring their testimony, it is worthy of note that Kootz must be aligned on the side of Hermann. Certainly he was not on the side of the stockholders or creditors of the old company. It was to him that Hermann went to borrow money, and Hermann agreed to pay him half of the profits of the underwriting transaction. After the transaction was over, Kootz asked for an accounting, and Hermann stated that "the money which he got from the old stockholders in the old company was not his own." "He accounted to me for profits which he made on the rest of the stock."

This testimony was given while Hermann was still living.

We are unable to reconcile Hermann's statement thus made to Kootz with any theory other than that the money derived from the sale of this new stock to old stockholders was to be used in retiring the preferred stock, as proposed by Hermann in his letter of April 28th and confirmed by the letter which was sent out to stockholders when the plan of reorganization was submitted to them. True, Kootz's testimony was oral. No writing supports his statement. It is, however, undisputed. In view of the fact that it was given before Hermann died, the latter's counsel was advised of the amounts paid to Kootz by Hermann as profits out of the underwriting deal. If the payments included the profits on this stock, the records would have shown it. Kootz's testimony, therefore, while oral, was capable of refutation by documentary evidence. It was the statement of a third party aligned, if at all, with Hermann. It was testimony which, if untrue, could have been proved to be false. It was not disputed.

■ It is argued for appellees that the agreement out of which the trust arose violated or conflicted with the underwriting agreement. We think not. The underwriting agreement provided:

"Out of the common stock, the management (was) to make such arrangement as it wishes with the old stockholders to provide them with participation certificates to induce them to consent to the transfer of the property without foreclosure."

Likewise, another paragraph provided that the common stock was passed to Hermann and by him to be used to provide participation certificates for such stockholders of the present corporation as give their consent to the plan of reorganization. Undoubtedly the idea of participation certificates was eliminated because foreclosure took place and the good will and cooperation of the old stockholders were sought in another way. It was both a practical and a happy solution of the problem. It furnished Hermann with cash he sorely desired. Even with this money he used cash of the corporation to meet his obligation. It gave the old stockholders an opportunity to retain their interest in the enterprise. They could purchase common stock in the new company at a figure below that which it was hoped the stock would be fairly worth. Money used to retire preferred stock issued to creditors eliminated those prior lien securities which in turn gave greater value to the common stock. We find nothing in a plan which used the stock for the laudable purpose of acquiring the good will and friendly cooperation of old stockholders and creditors who had it in their power to obstruct, if not defeat, the reorganization, that was inconsistent with an underwriting agreement wherein the then receiver was to have the stock of the new company first issued to him.

It is not necessary to discuss all the arguments advanced by appellees. It is sufficient to say that appellees' anxiety lest

creditors whose claims Hermann purchased might have been defrauded by the plan which contemplated the early retirement of the preferred stock, is unappreciated. Northern Pacific Railway Co. v. Boyd, 228 U.S. 482, 503, 33 S.Ct. 554, 57 L.Ed. 931.

■ We are equally well satisfied that appellants were not guilty of laches.

There was also corroboration of the appellants' theory to be found in the plan itself. In other words, the utter unfairness of the plan as Hermann carried it out and in support of which appellees now argue, would have prevented the acceptance of such a plan by the stockholders had it been thus presented to them and too it would doubtless have been rejected by the court.

Credibility of a witness may depend upon the reasonableness of his story.

■ The facts speak for themselves. Hermann was and had been the receiver of the company for three and one-third years. He occupied a fiduciary position to the stockholders and creditors. He was familiar with the business of the company during the receivership. Its operation had been successful as evidenced by the average net earnings of $400,000 per year. As receiver he was under obligation to deal fairly with all and to take no advantage of stockholders or creditors. Jackson v. Smith, supra. It is also fair to assume that he desired to retain the confidence of the court that appointed him.

Under the plan of reorganization the unsecured debts were to be reduced from $1,600,000 to approximately $240,000. Both the bonded indebtedness and the secured indebtedness were also reduced. In addition, *according to appellees' theory,* Hermann was personally to receive *without cost* all the stock of the new company. In short, the receiver was to close up the receivership by becoming the sole owner of all the stock for which the existing stockholders were to receive nothing. The equity represented by 300,000 shares belonging to hundreds of stockholders for which they had paid ten dollars per share was to be wiped out, and new stock was to be issued, all of it, to Hermann. To accept this theory is to overtax one's credulity.

On the other hand, appellants' version appeals to us as reasonable. There were outstanding 300,000 shares of stock of the old company of $10 par value per share.

They were widely distributed and the stockholders were purchasers of Gillette Rubber Company's tires. Under the reorganization plan the stock issue was to be one-third that of the old company. Par value was changed from $10 to $5.40. The stockholders of the old company were permitted to purchase stock in the new company, up to 49,000 shares, at $5.40 per share. In view of the reduction of debt and in view of the earning showings, this was a worth while concession to the old stockholders. But if this stock was to be sold to old stockholders at $5.40 who was to receive the proceeds,—the company or this receiver? Appellants say the proceeds were to be used to further improve the condition of the company—to retire preferred stock issued to creditors at fifty cents on the dollar. If this plan had been carried out nearly all preferred stock would have been eliminated. · Such a plan would have appealed to the old stockholders who were asked to surrender their stock in the old company. This was the written proposal submitted to them by the chairman of their committee and doubtless resulted in their joining Hermann and others in asking the court to approve the plan.

If this were not the understanding, why were 100,000 shares in the new company divided immediately upon their issuance, 51,000 going to Hermann's voting trustees and hundreds of certificates issued to old stockholders who even at that earlier date had subscribed for them? How did it happen that the price was $5.40 to them if there was no existing agreement on Hermann's part to sell to old stockholders at this figure? The issuance of this stock was on the date the books of the new company were opened. Equally significant is the fact that the proceeds were used to acquire preferred stock issued to creditors under the option provision therein appearing. But the preference stock was not *cancelled.* It was not *retired.* Notwithstanding Hermann in his letter of April 28 used the word "retired" this stock thus purchased was held by Hermann as his own and he later offered it to the directors with the threat that if they did not buy it for the corporation he would sell it elsewhere for a higher price. Now, it is argued from the fact that the directors paid Hermann for this stock out of company funds there could have existed no obligation on Hermann's part to retire the preferred stock from the proceeds of the sale of the common stock.

An examination of the records of the company in respect to this transaction does not support any such deduction. Nor does the study add respect for Hermann's methods. There were seven directors. Hermann was one. He was president of the company. At the time he offered this stock to the directors he held the stock control. Four of the directors were on salaries the continuation of which depended on Hermann. One of the four received a salary of $25,000, two received $12,000, and one, $9,000, per year. Moreover, another director had a secret agreement with Hermann to share in the profits from the transaction whereby Hermann acquired the stock of this company. Of the two remaining directors nothing is shown indicating limited or restricted capacity to act freely. One protested and stated that he understood the preferred stock purchased from funds derived from the sale of 49,000 shares of common stock was to be retired. He was advised that the right to enforce this obligation on Hermann's part rested with the stockholders and not with the corporation, and that the directors should purchase the stock "for it was worth more." This action, aside from the irregularity arising out of a president's dealing with his own company where directors were under his influence, shows that there was an impression, to put it mildly, that these 49,000 shares were transferred to Hermann in trust.

Had the claim been asserted by the directors it would not have established the existence of a trust anymore than failure to so assert it negatived the existence of a trust. Its only significance lies in the fact that there was an expressed belief by one of the directors that such a trust existed. He was silenced by an awesome statement that "the law" did not recognize the authority of the corporation to enforce the rights of stockholders.

*Transactions with the Deceased.* While our conclusions are based largely if not entirely on Hermann's letter of April 28 and the circular letter which was sent with the copy of the plan of reorganization, to all the stockholders *including Hermann,* there is strong support in favor of the existence of the trust to be found in the deposition of Kent and the oral testimony of one Doctor Runnels, which were excluded by the District Court on the ground that such statements violated section 325.16 of the Wisconsin Statutes.

Kent was an officer of a Chicago bank which carried the old Gillette Rubber Company's account. When that company became financially involved, Kent became chairman of a bondholders' and also the creditors' committee. He was not personally interested in either stocks or bonds or other claims against the Rubber Company. He actively participated on behalf of the creditors in the receivership proceedings, and also was active in the preparation of the underwriting agreement as well as in the plan of reorganization. Shortly after Hermann wrote the aforesaid letter of April 28 to Attorney Gilruth, who was attorney for this bondholders' protective committee, Kent testified to Hermann's seeing him in Chicago, in his bank in reference to the proposal contained in Hermann's letter of April 28.

■ It was this conversation which was excluded. That it was important and most persuasive can not be doubted. Kent said that in this conversation he suggested two or three modifications to Hermann's proposal, appearing in the letter of April 28. He suggested that the per cent of stock of the new company to be sold to the old stockholders should be reduced from fifty to forty-nine per cent thereby giving absolute control to Hermann. He also stated that the dollar mentioned in said letter be eliminated; that the price fixed for the stock be $5.40 instead of $5, forty cents to be used to cover expenses, etc. And most important of all, he said Hermann confirmed his offer to sell forty-nine per cent of the stock to old stockholders and use the proceeds to *retire* preferred stock. The exclusion of this testimony was on the ground that the witness was not competent because (section 325.16, Wis. Statutes) he related a transaction with a deceased person. As we construe the decisions, the Wisconsin Supreme Court has ruled otherwise in Dilger v. Estate of McQuade, 158 Wis. 328, 148 N.W. 1085; Lowry v. Lowry, 211 Wis. 385, 247 N.W. 323, 248 N.W. 472. In other words, according to these decisions, Kent was not a party through whom appellants traced their cause of action.

■ The ruling on Doctor Runnel's testimony turns on a different fact situation. The testimony by him given and which was stricken would have been objectionable on the ground that he was an incompetent witness due to said section 325.16, had it not been for the fact that he was placed

upon the witness stand by the appellees as their witness, and the door was thus by them opened to permit the introduction of his testimony on cross-examination. He was asked on direct examination, respecting a letter which he wrote to Hermann. On cross-examination he was asked about a statement appearing in said letter.

There was oral evidence of five or six other witnesses, all to the same effect, which corroborates appellants' theory of the existence of a trust. They testified to conversations with Hermann or to having heard Hermann state that as part of the plan of reorganization he was to sell 49,-000 shares of the stock to old stockholders at $5.40 per share and to use the proceeds to *retire* the preferred stock. We would have felt inclined, however, to accept the District Court's finding on this issue if appellants' case rested entirely upon oral testimony of witnesses, given in open court, exclusive of Kent's. That which makes appellants' case irresistible are the two written documents. They furnish unimpeachable support for the testimony of the other witnesses. The addition of the Kent testimony leaves us convinced beyond all reasonable doubt.

The question of relief—the amount of liability—is also before us. What is the amount for which appellees must account?

There is no ground for compromise as we view it. Either there was a trust which Hermann violated or there was no trust. If there existed a trust, then the estate of Hermann must respond to those in whose favor it ran. The decision of the Supreme Court in McCandless v. Furlaud, 296 U.S. 140, 56 S.Ct. 41, 80 L.Ed. 121, has removed one more obstacle to the enforcement of liability against recreant trustees.

As we view this suit it was one in equity to enforce a trust. It had possession of the *res*—the proceeds derived from sale of property which was held in trust. Its powers were therefore plenary.

Hermann was to sell 49,000 shares of stock to old stockholders at $5.40 deducting a fair sum therefrom for trouble and expense. There is some evidence to indicate this deduction should be 40¢ and we accept this figure. He sold 37,343 shares and should have devoted the proceeds to the retirement of preferred stock. He must account for the proceeds, together with interest at 6% from November 15, 1925, to November 15, 1929, the date of the receivership and the date when the funds were tied up in this suit.

The balance of the stock he did not sell. The determination of his liability therefor has given us no little trouble. Hermann, as trustee, was under obligation to sell all of the 49% of the stock of the new company and retire new preferred stock. He only sold 37,343 shares. He retained 11,657. Had he sold this stock he could have retired $58,285 of the preferred stock. Ordinarily then, his liability would be $58,285 plus interest at 7%. The interest rate is fixed at 7% because that was the dividend rate of the preferred stock. On the other sum the interest is fixed at 6% because that is the legal rate in Wisconsin.

The market value of the 11,657 shares which Hermann withheld rose from $5.40 to $21 per share, and its influence on Hermann's liability is what troubles us.

The stockholders' damage was represented by Hermann's failure to retire the preferred stock without cost to them. As a matter of fact the corporation did retire all of its stock. It used its earnings to do so when Hermann should have retired part of it without cost to the corporation. Attempting now to enforce the trust, the court can only compel Hermann to account for the part he failed to do—retire so much of the 7% preferred stock as could have been purchased through the sale to old stockholders of 11,657 shares. He must therefore account for $58,285, with interest at 7% from November 15, 1925, to November 15, 1929.

The interest allowance on both sums shall be compounded annually.

Appellees ask for a diminution of liability to the extent of $71,500.58 paid to preferred creditors by Hermann.

Appellants have sought relief in a court of equity where they have demanded the creation and enforcement of a trust. Seeking equity they should offer to do equity. Maxims which impose upon the party who seeks equity the duty of coming into equity with clean hands and offering to do equity are particularly applicable. All stock which Hermann was to sell was not sold, and the preferred stock in the new company was not retired as the plan of reorganization required. However, Hermann did pay preferred creditors, and therefore we think his executors should be allowed a reduction of

liability of the amount thus paid, to wit, $71,500.58.

The decree of the District Court is reversed with directions to the District Court to enter one in accordance with the views here expressed and to make such allowance for attorney's fees and costs as may be just and proper and as the equities demand. The decree shall fix the amount of appellees' liability as follows: From the amount which Hermann received from the sale of the common stock, there shall be deducted $71,500.58, the amount Hermann paid to preferred creditors. The balance shall draw interest from November 15, 1925 to November 15, 1929, at 6% compounded. To this sum should be added $58,285 with interest at 7% from November 15, 1925, to November 15, 1929, compounded. Appellants shall recover their costs in this court.